2022 IL App (1st) 181463

FIRST DISTRICT
THIRD DIVISION
June 29, 2022

No. 1-18-1463

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 12 CR 00507 (02) |
| | ) | |
| CRYSTAL VALDEZ, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Presiding Justice Gordon specially concurred, with opinion.
Justice McBride specially concurred, with opinion.

**OPINION**

¶ 1     This appeal arises from the tragic and horrifying death of Christopher Valdez, the son of

defendant Crystal Valdez. Christopher was last seen alive at a neighbor's Thanksgiving dinner in

2011. A victim of ongoing child abuse, he was, on that day, visibly bruised, sullen, and unable to

hold down what little food he ate. The next day, Christopher's fourth birthday, relatives found

his dead body rolled up in the covers on defendant's bed. Ubiquitous external injuries were

disguised, however thinly, by a layer of foundation makeup. Severe internal injuries were

inflicted shortly before his death, within days at least and probably sooner.

¶ 2     Separate juries convicted defendant and her live-in boyfriend, Cesar Ruiz, of first-degree

murder. (Ruiz, whose conviction we have affirmed, is not a party to this appeal. *People v. Ruiz*,

2018 IL App (1st) 152458-U.) The State's theory was that defendant and Ruiz both participated

in Christopher's final and fatal beating on Thanksgiving. As to defendant here, the jury was instructed on alternative theories of first-degree murder—principal liability and accountability—and returned a general verdict of guilty. (Ruiz's jury did the same. *Id.* ¶ 41.)

¶ 3    Defendant raises several points of error on appeal, including (1) the erroneous admission of propensity evidence, (2) the erroneous exclusion of expert opinion testimony regarding her mental retardation and alleged history of physical and sexual abuse, (3) the denial of a child-endangerment jury instruction, as a lesser-included offense of the State's "parental duty" theory of accountability for murder, (4) misconduct by the State in closing argument, and (5) the trial court's failure to consider mitigating evidence at sentencing. We affirm.

¶ 4                                BACKGROUND

¶ 5                                     I

¶ 6    Defendant lived in a small coach house, a converted garage, on the property of Fernando Ruiz and his fiancée, Marilu Romo. Defendant's parents, Tom and Mary Valdez, lived across the alley from the coach house, some 25 feet away. Defendant had four children, all from a previous relationship with Abner (aka Giovanni) Marroquin. In 2011, defendant's two younger children—Christopher, approaching his fourth birthday, and Christine, a year or so older—lived with her in the coach house. Her two older children, Giovanni and Cindy, lived across the alley with Tom and Mary. Defendant's brother, Joe, and his wife, Katrine, sometimes visited defendant and the kids. Such was the cast of witnesses at trial: along with medical and police personnel, Katrine and Marilu testified for the State, while Tom testified for the defense. (With so many individuals, we will try to provide reminders of who is who throughout the opinion.)

¶ 7    The jury heard that Tom arranged for defendant to live in the coach house and paid her rent and utility bills. The jury heard that defendant had lived with her parents for much of her

adult life thus far, that she could not hold down a job (she lasted two weeks at a factory and two hours at Kentucky Fried Chicken), and that she relied on others for income. The jury heard that she could not drive and that routine tasks—like feeding and bathing the kids or doing laundry—were frequently, though not always, handled at Tom and Mary's place.

¶ 8 The jury heard these facts because the defense elicited them. But the jury never heard why, at least in the defense's view, a grown woman and the mother of four was so dependent on others. To foreshadow an issue to come, defendant had a full-scale IQ of 58, placing her in the "mildly mentally retarded" range. The trial court, however, barred the defense from offering any expert testimony pertaining to her intellectual disability—or her alleged history of physical and sexual abuse—which the defense proposed to offer for the purpose of rebutting the mental-state element (knowledge) of the "parental duty" theory of accountability that the prosecution had to prove. All the defense could say, by way of context and explanation, was that defendant took special education classes until she dropped out of high school during her first pregnancy. We will have more to say about the excluded evidence in due course.

¶ 9 In any event, defendant met Cesar Ruiz in April 2011. Cesar was Fernando's cousin; he was staying, at the time, in the property's main house with Fernando and Marilu. He moved in with defendant all of three days after they met. And by all accounts, he did not mix well with defendant's family. (Or, for that matter, with Marilu.)

¶ 10 Tom testified that Cesar was very controlling and prevented defendant from seeing her parents, though they lived so close and were paying defendant's rent. Among other things, Cesar changed the locks on the coach house and kept a large, intimidating guard dog, a Cane Corso, at the house. Tom found it harder to reach defendant on the phone, as if she wasn't taking his calls. All in all, defendant's relationship with her parents changed significantly, and for the worse,

after Cesar came along. Katrine confirmed that defendant had less contact with her family in general.

¶ 11    And even apart from Cesar, the Valdez family had friction of its own. Around the time of Cesar's arrival, Tom explained, they were trying to "get back together" and "make [the] family a little bit better." But against this backdrop, Christopher began to show signs of the physical abuse that would ultimately claim his life.

¶ 12                                        II

¶ 13    The first signs of abuse emerged on July 1, 2011. Christopher had a "bump" on his head. Tom testified that he noticed the bump when Christopher was playing in the yard. At defendant's domestic-battery trial—which we will discuss shortly—Tom had testified that defendant called and asked him to look at the bump. Either way, Tom claimed that he did not notice any other injuries besides that bump, but he did tell defendant and defendant's mother, Mary, to take Christopher to the hospital.

¶ 14    Christopher was admitted to Hope Children's Hospital for evaluation, where he was seen shortly after midnight on July 2, by registered nurse Sarah Wallenberg. Defendant, but not Mary, was with him.

¶ 15    Nurse Wallenberg immediately suspected abuse. Christopher had "a very large bump" on his head; other "bruising" on his scalp, along with thinned-out hair, suggesting that his hair was forcefully pulled; a black eye; and bruises and abrasions up and down his back, his torso, and his arms and legs—"just everywhere," as the nurse put it. Some of these injuries were fresh; others were already healing.

¶ 16    Nurse Wallenberg asked defendant what happened. Defendant said that Christopher fell out of a chair and hit his head and that the marks all over his body were mosquito bites. The

nurse was not impressed with these explanations. The marks were bruises, she insisted, not mosquito bites, and a fall from a chair could not plausibly explain the black eye. Nurse Wallenberg admonished defendant to stop lying so she could properly treat Christopher. Defendant finally acknowledged that she had "grabbed" and "spanked" him.

¶ 17    At some point, Nurse Wallenberg called the police. When defendant left the room to talk to a detective, Nurse Wallenberg asked Christopher if "mommy" hit him. He said yes. She asked if "daddy" hit him. He said no. (Recall that "daddy" was Abner Marroquin, not defendant's current boyfriend, Cesar—a detail the nurse did not know.)

¶ 18    Meanwhile, in the middle of the night, defendant had called Katrine (her sister-in-law, recall), to whom she often turned for guidance. Defendant said that Christopher fell off a table at the laundromat and was now at the hospital for treatment. Defendant also said that she was speaking to Detective Smith from the Chicago Police Department. Katrine told her she had nothing to worry about as long as she told the truth.

¶ 19    After meeting with Nurse Wallenberg and observing Christopher, Detective Smith spoke to defendant. He told defendant that her statements to Nurse Wallenberg were not consistent with Christopher's injuries. Defendant started to cry and said, "I am getting help, I punched him," and "I hit him, I have anger issues, I get mad, I get nervous, I slapped him, and I grabbed him real tight."

¶ 20    Defendant's explanations to Katrine "were always changing," too. First, Christopher fell off a table. Then out of a chair. Along the way there was "something about mosquitos." After meeting with an attorney, defendant eventually changed her tune and said that she "swatted" Christopher.

¶ 21    Based on this incident, defendant was convicted of a misdemeanor domestic battery. See 720 ILCS 5/12-3.2(a)(1) (West 2010). The State offered this conviction into evidence, and the jury was instructed that it could consider the conviction, and defendant's underlying conduct, as evidence of her propensity to abuse Christopher. See 725 ILCS 5/115-7.4 (West 2010).

¶ 22    Over defense objections (on grounds we will explain later) the State offered two further instances of propensity evidence. First, at a baby shower on November 6, 2011, Katrine saw Christopher with another black eye. This time, it was covered in foundation makeup. During the car ride home, defendant told Katrine that Christopher climbed onto a display bed at JC Penney. Mary interjected and said that Christopher was jumping around on the bed, when he fell and bumped his eye "on the little step of the display."

¶ 23    Second, Marilu testified that a "few weeks" before Thanksgiving—she could not be any more specific—she saw defendant "smack" Christopher in the face. As the defense clarified on cross-examination, it was a single smack, with an open palm, on Christopher's cheek.

¶ 24                                    III

¶ 25    Joe and Katrine (defendant's brother and sister-in-law) hosted the Valdez Thanksgiving in 2011. Tom and Mary came, with Giovanni and Cindy (defendant's older children). But defendant did not join her family. She accompanied Cesar to dinner with Cesar's father, Fernando, and his fiancée, Marilu. Christopher and Christine went with them.

¶ 26    Christopher wore a hooded sweatshirt to dinner, which Marilu found odd, since it was not cold out (despite being late November) and the house was hot from the oven. Odder yet, he kept the hood pulled down over his forehead, leaving his face visible only from the nose down. But at one point, the hood slipped, and for a brief moment, Marilu could see more of his face. He had a bruise on one of his eyelids. Cesar promptly got up and pulled the hood back over Christopher's

eyes. Christopher ate very little dinner. He sat, quiet and sullen, with his head hanging down and his hands held together under the table.

¶ 27    According to Marilu, Cesar went back to the coach house after dinner. Christopher then vomited on the floor. After defendant cleaned it up, she told Marilu that she wanted to show her something, but that Marilu couldn't tell anyone what she saw. Defendant lifted up Christopher's shirt, revealing bruises on his stomach and chest.

¶ 28    Marilu testified that defendant, when asked, denied that either she or Cesar had caused these injuries. Marilu then told defendant to get her stuff and leave.

¶ 29    In her handwritten statement, however, Marilu never said that she asked defendant who caused these injuries. Rather, she bluntly told defendant not to let "other people" hit her kids. In this respect, her handwritten statement was consistent with her oral statement to Detective Carr, as her cross-examination and a stipulation by the parties confirmed. (Marilu's statements were made on November 26, two days after Thanksgiving, and she claimed to disclose "everything" about her conversation with defendant in her handwritten statement. But she was also bedridden that day, having spent the intervening day in the hospital receiving insulin treatment for her diabetes.)

¶ 30    Marilu told Fernando about Christopher's black eye, but not about his bruises. They agreed that it would be best if they didn't get involved, and they decided not to call the police.

¶ 31    The next morning, after a graveyard shift at work, Marilu called Katrine. As she did with Fernando, Marilu told Katrine about Christopher's black eye, but not the bruises on his torso. Katrine made an anonymous call to DCFS and was told that a police officer would be dispatched immediately for a well-being check. And an officer was dispatched, but the officer's knocking went unanswered. Katrine did not call Tom and Mary.

¶ 32    Later that day, Marilu called Katrine again and elaborated, somewhat, on her concerns. She still did not mention Christopher's bruises, but she did add that he was unable to keep his food down. Katrine and Joe decided to check on Christopher. They would use his present—it was his fourth birthday, after all—as a pretext for the visit. They arrived around 2:00 p.m., on November 25, 2011.

¶ 33    As they approached the coach house from the alley, Katrine saw a shattered mirror and a broken lamp in the trash. (The police would later photograph those items.) She recognized them as defendant's. They knocked on the door and various windows for 15 minutes. Defendant finally answered the door, but only after Joe tried to enter through a window, where he was met by Cesar's dog.

¶ 34    Defendant was fully dressed, with her hair done and makeup on. When she opened the door, she stretched and acted as if she just woke up. Katrine asked about the kids. Defendant said they had Thanksgiving dinner at Cesar's mom's house and that the kids were still there. Katrine did not believe it. She said she had a gift for Christopher and forced her way past defendant. Joe followed her into the coach house.

¶ 35    The house was in disarray, which was not at all how defendant normally kept it. There were packed totes stacked up in the kitchen. A half-eaten turkey sat on the counter. Katrine also noticed scratches on defendant's palms, which she claimed were from the dog, and scratches on her neck, which she claimed were a rash.

¶ 36    Defendant tried to block the entrance to the bedroom. She said that Katrine should not go in there because Cesar was taking a nap. Katrine looked past defendant and saw Cesar's legs on the bed. He was wearing jeans and gym shoes. He got up, yawned—or feigned yawning—and said they had a "long night" at his mom's house.

¶ 37    Katrine saw Christine (Christopher's slightly older sister) fully dressed and wearing a coat and shoes, sitting atop a "lump" on the bed. Christine ran over to Katrine, who pushed defendant out of the way and went into the bedroom. She pulled back the covers and found Christopher's body. He was covered in bruises, which in turn were covered in foundation makeup—much like the makeup that covered his black eye at the baby shower. (Detective Padilla also noted makeup on nearly every bruise he touched when he examined Christopher's body later at the hospital.) Katrine yelled, "What did you do? Did you touch Christopher?"

¶ 38    When Joe saw Christopher's body, he immediately punched defendant and said that she was going to jail. Defendant said "he" did it, meaning Cesar. Cesar responded that "she" did it, meaning defendant. The eventual codefendants went back and forth, blaming each other.

¶ 39    After punching defendant, Joe grabbed Cesar by the throat and slammed him into the drywall, causing a big hole. Joe punched Cesar repeatedly and kept choking him, until Katrine intervened. Joe relented and said, "You m*** are going to jail," before calling 911.

¶ 40    The 911 call was recorded, and an excerpt was played for the jury. In the background, a female voice can be heard saying, "I killed him, my Christopher." Katrine identified the voice as defendant's. She acknowledged that she didn't hear defendant say those words at the time— when she was trying, in vain, to perform CPR on Christopher. But the recording, which is available in the record on appeal, says what it says, wherever Katrine's attention may have been focused at that fraught and chaotic moment.

¶ 41    Defendant and Cesar were arrested. In the squad car, defendant reportedly said, "I don't want to go to jail. I'm going to hell."

¶ 42                                    IV

¶ 43    Chicago Police Detective Padilla came to the scene to investigate. A couple weeks later,

Joe, Katrine, and Tom came to clean out the coach house. Their observations were essentially the same. Defendant's and Cesar's clothes, along with a pair of bloody socks, were packed in totes in the kitchen. The kids' clothes were packed in a wheeled hamper. The closets were empty, the dresser largely empty. There was a hole in the drywall—not the hole Joe created when he slammed Cesar into the wall—where the broken mirror once hung.

¶ 44    Defendant normally kept the house neat, with the clothes in drawers or hanging in the closet. Marilu confirmed that the clothes were not packed up like this, and that there was no hole in the wall, when she visited defendant the day before Thanksgiving to discuss the dinner plans.

¶ 45    On the nightstand were two bottles of foundation makeup and two cell phones—defendant's and Cesar's. Stipulated records confirmed that defendant was the subscriber on one phone from April 2010 to November 26, 2011. The records showed call activity on Thanksgiving.

¶ 46    Defendant submitted to a custodial interrogation, but her custodial statements were not admitted into evidence, as both the defense and State experts concurred that defendant's intellectual and cognitive deficits left her unable to knowingly waive her *Miranda* warnings.

¶ 47                                 V

¶ 48    Dr. Laura Moser-Woertz, an assistant medical examiner, performed Christopher's post-mortem exam. Christopher was significantly underweight for his age, a result of evident malnutrition and, perhaps, associated dehydration. She ruled his death a homicide, caused by the sum total of his injuries, both internal and external, all of which she attributed to child abuse.

¶ 49    Dr. Moser-Woertz counted no fewer than 54 injuries, though that was an undercount, in her view, since some of the counted injuries were actually clusters of injuries that were too close

10

together to be clearly distinguished. All in all, there were "so many injuries on the body, it was hard to document every single one of them."

¶ 50    Externally, Christopher's body was riddled, from head to toe, with bruises, lacerations, and swelling, including on his scalp and eyelids. Many of the injuries were sustained close in time to death, within days at most, while others were older. And many of them were covered in a "tan-brown substance that resembled makeup" and was easily wiped off. Of note was a pattern of injuries tracing Christopher's ribcage, a pattern that evidenced significant blunt-force impact to the area. The State would go on to argue that it was caused by slamming Christopher into the wall—the source of the hole in the drywall where the broken mirror used to hang.

¶ 51    Christopher also suffered significant internal injuries to various organs and tissues in his abdominal cavity, as well as blood in his spinal column. These injuries were all caused by blunt-force trauma—such as punching or slamming him into a wall—within days of his death, and some "probably even closer than that." Dr. Moser-Woertz also testified that the abdominal and spinal-column bleeding would have affected Christopher's ability to eat.

¶ 52                                              VI

¶ 53    After receiving instructions on intentional and knowing first-degree murder, on theories of principal liability and accountability—the latter based on defendant's failure to perform her "parental duty" to protect Christopher from abuse at the hands of Cesar—the jury returned a general verdict of guilty. The trial court sentenced to defendant to 35 years in prison.

¶ 54                                          ANALYSIS

¶ 55                                              I

¶ 56  Defendant first argues that the erroneous admission of propensity evidence denied her a fair trial. She objects, in particular, to (1) Katrine's testimony that Christopher had a black eye at

the baby shower and (2) Marilu's testimony that defendant smacked Christopher in the face a few weeks before Thanksgiving. She does not (and cannot plausibly) argue that the trial court erred in admitting her domestic-battery conviction, and evidence pertaining to the conduct and injuries on which it was based, as evidence of her propensity to abuse Christopher.

¶ 57    When, as here, a defendant is accused of a murder involving an act of domestic violence, the defendant's prior act(s) of domestic violence are admissible (subject to certain limitations) as propensity evidence. 725 ILCS 5/115-7.4(a) (West 2010). We review the trial court's ruling on the admissibility of other-crimes evidence for an abuse of discretion. *People v. Pikes*, 2013 IL 115171, ¶ 12.

¶ 58                                            A

¶ 59    We begin with Katrine's testimony that Christopher had a black eye, covered by foundation makeup, when she saw him at a baby shower on November 6, 2011, roughly three weeks before his death. For this to be admissible as other-crimes evidence (offered for propensity or any other purpose), the State had to show that the injury was caused by abuse that defendant committed or at least participated in. *People v. Thingvold*, 145 Ill. 2d 441, 445 (1991); *Pikes*, 2013 IL 115171, ¶ 15. But the standard of proof here is decidedly low: "more than a mere suspicion" is all the State must establish. *Thingvold*, 145 Ill. 2d at 456; *People v. Johnson*, 2020 IL App (1st) 162332, ¶ 52.

¶ 60    Defendant claims that the State's evidence did not rise to the level of "more than a mere suspicion." Defendant first notes that Katrine did not claim to see defendant cause this particular injury. All Katrine could say about it is what defendant and Mary told her: Christopher fell off a bed at JC Penney and hit his eye "on the little step of the display," which implies that his black eye was not caused by an act of abuse at all, much less one that defendant personally committed

or aided. And while the State hypothesized at trial that defendant caused this injury when she "smacked" Christopher in front of Marilu "a few weeks" before his death, Marilu clarified on cross-examination that she saw a single "slap" on the cheek with an open palm, which defendant claims would not have caused a black eye.

¶ 61     But even granting defendant these points, there is more to the story. Defendant's recent domestic-battery conviction was itself evidence of her propensity to abuse Christopher and thus could be considered in this context.

¶ 62     Four months before the baby shower, Christopher was admitted to the hospital with head-to-toe injuries—including a black eye. Defendant claimed that he fell off a table or out of a chair. Nurse Wallenberg recognized that a fall from a piece of furniture was unlikely, at best, to cause a black eye like Christopher's. (Granted, such a fall could cause a bump on the head, which he also had, or various other injuries.) When pressed by Detective Smith, defendant admitted, among other abusive acts, that she "punched" Christopher. And whatever defendant may think of an open-handed slap to the face, a *punch* to the face could most certainly cause a black eye.

¶ 63     What's more, defendant did not just admit to a one-off incident but rather suggested that this was a manifestation of an ongoing, repeatable problem: "I hit him, I have anger issues, I get mad, I get nervous ***." Christopher also told the nurse, when asked, that his mother hit him. By November, defendant had been convicted of a domestic battery based on this incident. And when Katrine confronted defendant (and Mary) after the baby shower, the explanation defendant offered, once again, was that Christopher got a black eye by falling from a piece of furniture. Only this time, the nurse and detective were not around to challenge it. And this time, after defendant had been convicted of a domestic battery involving a basically identical injury (among others), an obvious if largely unsuccessful attempt had been made to hide the injury with

makeup.

¶ 64    In sum, the evidence established that defendant had recently caused an identical injury to Christopher, by means of abusive conduct that, by her own admission, was a manifestation of an ongoing problem—her failure to control herself, and her temper, when dealing with Christopher. This evidence, as we noted above, could be considered for its bearing on defendant's propensity to commit other such acts of abuse. So while the State did not link defendant to *this* black eye at the baby shower through an eyewitness or defendant's own admission, the available evidence still adds up to "more than a mere suspicion" that defendant, and not the bedding display at JC Penny, was the cause of Christopher's injury. We find no error in admitting the evidence of Christopher's black eye in early November.

¶ 65    We disagree with defendant that the evidence here is comparable to that in *Thingvold*, 145 Ill. 2d at 455-56, which failed to establish "more than a mere suspicion" that the defendant was involved in the prior bad act. The defendant there was charged with soliciting one Nalan to murder the defendant's wife, Barbara. The State offered evidence of a prior act (relevant to motive and intent) in the form of a previous attack Barbara suffered—a brutal but non-fatal stabbing attack. *Id.* at 455.

¶ 66    The State tried to tie the defendant to that prior stabbing attack through two witnesses, Haffendon and Wagaman. They both testified, in sum, that the defendant had solicited their participation in Barbara's murder and had suggested stabbing as the mode of attack because Barbara had "recently" had abdominal surgery, and thus a stab wound would likely cause her to bleed to death. *Id.* at 451-52, 456. Notably, however, Wagaman claimed that defendant mentioned Barbara's "recent" surgery upwards of *three years* before the stabbing (though the timing of defendant's alleged remarks to Haffendon was less clear). See *id.* at 451-52.

14

¶ 67    That was all the State could muster. On the other side of the balance, the State admitted that the defendant did not attack Barbara himself, and all the witnesses he allegedly solicited to kill her testified that "they took no action toward[ ] that end." *Id.* at 456. According to Nalan, the defendant said that the killer should tamper with the brakes on Barbara's car, rather than stab her. *Id.* And while Barbara was later stabbed again, that time fatally, the State acknowledged that it had no evidence linking the defendant to that crime. *Id.* at 460. All in all, the testimony of the two witnesses may have raised some suspicions but nothing more.

¶ 68    The evidence in this case was far stronger than that in *Thingvold* and was sufficient to constitute "more than a mere suspicion" (*id.* at 456). We find no error in the admission of this evidence.

¶ 69                                    B

¶ 70    That brings us back to Marilu's testimony that she saw defendant "smack" Christopher a few weeks before Thanksgiving. Defendant does not dispute that, with proper disclosure, this testimony would be admissible as propensity evidence under section 115-7.4. Her argument, instead, is that the State failed to provide the required disclosure.

¶ 71    When the State intends to offer evidence of prior incidents of domestic violence, "it must disclose the evidence, including statements of witnesses or a summary of the substance of any testimony, at a reasonable time in advance of trial, or during trial if the court excuses pretrial notice on good cause shown." 725 ILCS 5/115-7.4(c) (West 2010).

¶ 72    The crux of defendant's argument is that the State did not include Marilu's testimony in its pretrial motions to admit proof of other crimes. In those (two) motions, the State specifically sought to admit defendant's domestic-battery conviction and Katrine's testimony about the November black eye under section 115-7.4. But not a word about Marilu's testimony.

¶ 73    The State's response, both at trial and on appeal, has been twofold. One: Marilu told the police that she saw defendant smack Christopher, and that statement was disclosed in a police report produced in discovery; thus, the defense was on notice of Marilu's potential testimony. Two: Because Marilu witnessed the smack a few weeks before Thanksgiving, it was the very act that caused Christopher's November 6 black eye, which *was* disclosed in a pretrial motion. The trial court agreed that the described events were "close enough"—in time, as we understand the judge's remark—to be reckoned one and the same. On this basis, the court allowed Marilu's testimony over defense objection.

¶ 74    We are not as confident as the State that the open-handed slap to the face that Marilu witnessed would be sufficient to cause a black eye. We are not medical experts, though common experience suggests that, while a closed-fist punch could undoubtedly cause a black eye, an open-handed slap to the face would be at least less likely to produce that result. In any event, if we granted that the police report's mention of the slap Marilu witnessed was sufficient to give notice of this testimony, the question remains: Did the disclosure of Marilu's statement, via the police report, in pretrial discovery satisfy the State's disclosure obligation under section 115-7.4(c)?

¶ 75    At least one appellate decision, *People v. Braddy*, 2015 IL App (5th) 130354, all but holds that it does. We phrase it that way because *Braddy* construed the disclosure provision in the related statute that governs the use of other-crimes evidence in *sex-offense* cases. 725 ILCS 5/115-7.3(d) (West 2018). But the provision is identical to the one at issue here. Compare *id.* § 5/115-7.4(c). And for that matter, so is the disclosure provision that applies to the use of other-acts evidence under Illinois Rule of Evidence 404(c) (eff. Jan. 1, 2011). We see no reason to interpret any of these three identical provisions differently. So it is worth examining *Braddy*.

¶ 76    In *Braddy*, 2015 IL App (5th) 130354, ¶¶ 21-23, witness statements alleging prior acts of sexual abuse by the defendant were disclosed in a DCFS report tendered to the defense during discovery, but the State never explicitly moved to admit those statements under section 115-7.3. This court found "nothing in the statutory language" that required the State to do so. *Id.* ¶ 24. And because the "nature and substance of the testimony was evident" from the report, the defense could not claim that it was "taken by surprise." *Id.* ¶ 23. The report thus satisfied the disclosure requirement. *Id.* ¶ 24; see 725 ILCS 5/115-7.3(d) (West 2012). The State says much the same about Marilu, albeit in passing, and without citation to this or any other authority.

¶ 77    *Braddy*, as we read it, holds that the disclosure of a witness's statement in discovery is all that the other-crimes disclosure provisions require; the State does not need to disclose *its intent to use the statement as other-crimes evidence* at trial. But in *People v. Peterson*, 2017 IL 120331, ¶ 117, which construed the identical disclosure provision in Rule 404(c), our supreme court said that the Rule "requires the State to disclose its intent to introduce [bad-acts or other-crimes] evidence 'at a reasonable time in advance of trial, or during trial if the court excuses pretrial notice on good cause shown' " (quoting Ill. R. Evid. 404(c) (eff. Jan. 1, 2011)).

¶ 78    The question in *Peterson* was whether there was good cause to excuse the State's failure to provide pretrial notice of its intent to offer bad-acts or other-crimes evidence. *Id.* ¶¶ 117, 126. The evidence in question came from a witness whose name was disclosed on the State's witness list and who had testified at a pretrial hearing. *Id.* ¶¶ 117-19. It was clear, in other words, that the State had disclosed the witness testimony and its intent to call that witness at trial; but the State did *not* include this witness's testimony in its pretrial motion to admit bad-acts or other-crimes evidence. *Id.* ¶ 118.

¶ 79    Ultimately, the supreme court agreed with the trial court that the State had made a good-

faith mistake in believing that the witness's testimony concerned acts "intrinsic" to the charged conduct, rather than "extrinsic"—that is, bad-acts or other-crimes—evidence; thus, it was "not subject to the notice requirement" of Rule 404(c). *Id.* ¶¶ 120-21.

¶ 80 But the court's ultimate conclusion is not what concerns us. The *premise* of the supreme court's holding in *Peterson* is that it was not enough that the State turned over the witness statement and pretrial testimony and its intent to use that evidence at trial. To properly disclose, the State was required to disclose not only the evidence itself but *its intent to offer it as other-crimes evidence*, for a particular stated purpose. *Id.* ¶ 117. The State's failure to specifically disclose its intent to use this evidence as other-crimes evidence was what required an excuse, or a showing of good cause, in the first place.

¶ 81 In short, the holding in *Braddy*, 2015 IL App (5th) 130354, ¶ 23, that disclosing the "nature and substance of the testimony" is sufficient to satisfy an other-crimes disclosure, cannot be reconciled with our supreme court's clear statement in *Peterson* that a specific intent to use that evidence as other-crimes evidence, for a particular purpose, is required. While that was not the direct holding in *Peterson*, it was the operative premise for the entire analysis; if merely disclosing the "nature and substance" of the testimony had been sufficient, as *Braddy* held, the supreme court would have had no need to consider whether to excuse the disclosure violation, for it would not have been a violation in the first place.

¶ 82 For what it's worth, if operating from a blank slate, we would interpret the disclosure requirement as our supreme court understood it. For one thing, an obvious purpose of the disclosure provisions is to ensure that the trial court can rule on the admissibility and proper use(s) of any other-crimes evidence (propensity, *modus operandi*, etc.) *before* it is put in front of a jury, where it may invite an improper and prejudicial inference. A rule that requires the State to

specify in advance the other-crimes evidence it intends to offer, and the purpose(s) for which it intends to offer it, will accomplish this goal far more effectively and efficiently than a rule that requires the defense to guess at the State's intentions and potentially inundate the trial court with anticipatory motions *in limine*, many of which may be entirely off the mark and unnecessary.

¶ 83    *Braddy*, in effect, interprets the other-crimes disclosure requirement as merely reiterating the State's general discovery obligations under Illinois Supreme Court Rule 412(a)(i) (eff. Mar. 1, 2001)—at least with respect to witness statements, the source of much of the other-crimes evidence in a typical case. See *Braddy*, 2015 IL App (5th) 130354, ¶¶ 20-24. In other words, the disclosure provisions, as *Braddy* construes them, do not require the State to do anything it is not already required to do, before introducing other-acts evidence through the testimony of a named witness. That interpretation robs the disclosure provision of any meaningful purpose.

¶ 84    We thus will not follow *Braddy*. The State violated the disclosure provision of section 115-7.4(c) by failing to include Marilu's testimony in its pretrial motions to admit other-crimes evidence. It was error to allow that testimony.

¶ 85    But the error in allowing her testimony does not automatically entitle defendant to relief; she must also show how the lack of pretrial notice prejudiced her ability to defend against the State's use of the evidence. *Peterson*, 2017 IL 120331, ¶ 128 (citing *United States v. Skoczen*, 405 F.3d 537, 548 (7th Cir. 2005)). If the lack of pretrial notice impaired the defense, we have not been told how. And to our eye, we see none. Even without requesting a continuance, defense counsel effectively cross-examined Marilu. See *id.* ¶¶ 128-29. In particular, counsel effectively rebutted the State's theory that Marilu witnessed the event that caused Christopher's black eye in early November. As we noted above, counsel elicited that Marilu saw one open-handed slap on the cheek, with the clear suggestion that such a slap would not have produced the black eye. The

admission of Marilu's testimony without pretrial notice was error, but the lack of notice did not prejudice defendant.

¶ 86    And in any event, the erroneous admission of other-crimes evidence does not require reversal unless the evidence likely swayed the jury's verdict. *People v. Hall*, 194 Ill. 2d 305, 339 (2000). The other-crimes evidence offered through Katrine and Marilu further implicated defendant in a pattern of physical abuse that ultimately culminated in Christopher's death. But even without this evidence, the State's basic theory of principal liability—that defendant at least participated in Christopher's fatal beating, just as she had beaten him before—had ample support in other, unchallenged evidence.

¶ 87    For one, there was defendant's recent domestic-battery conviction, which we discussed above. That alone was powerful evidence of defendant's propensity to hit Christopher. And not merely to slap him on the cheek, as Marilu saw, but to *punch* him, as she admitted having done on occasion, and otherwise *beat* him—causing head-to-toe injuries that resulted in a hospital admission for Christopher and a criminal conviction for defendant. Defendant intimated, clearly enough, that this was not a one-off incident, but rather part of an ongoing problem with controlling her temper. With or without the bad-acts evidence offered through Katrine and Marilu, the jury would almost certainly view a serious beating of Christopher, at defendant's hands, as all too likely to recur.

¶ 88    And then there was defendant's spontaneous admission, "I killed him, my Christopher," uttered in the background while Joe was speaking to the 911 dispatcher. The defense argued below that she was merely blaming herself for what happened to Christopher. There is certainly room for that possibility, but a jury would have been well within its province, particularly given her recent domestic-violence conviction involving a harsh beating of her child, to take this

20

statement literally.

¶ 89    The combination of defendant's recent domestic-violence conviction and her spontaneous admission would render any error in the admission of further bad-acts evidence harmless. More generally, it shows that the State presented a strong case on its theory of principal liability.

¶ 90                                                    II

¶ 91    We next consider defendant's claim that the trial court excluded psychiatric testimony relevant to the *mens rea* requirement of the accountability theory for which defendant was charged (in addition to being charged as a principal). The State's accountability theory of first-degree murder was based on "parental duty," which required, in short, that defendant had knowledge of "a substantial risk of serious harm" if she did not intervene to protect Christopher from Cesar. See *People v. Pollock*, 202 Ill. 2d 189, 215 (2002); 720 ILCS 5/9-1(a)(1)-(2) (West 2018).

¶ 92    Defendant argued that this proposed psychiatric testimony went to her knowledge—her ability to understand and appreciate the substantial risk of serious harm to her son if she did not intervene to protect him from Cesar. Her argument is this: there is no direct evidence that she was present when the fatal beating was inflicted on Christopher; she could nevertheless be liable for her son's death if she left him with Cesar despite knowing of the risk of death or serious harm; but her mental and intellectual infirmities prevented her from knowing that risk, and thus, the evidence was relevant to negate the *mens rea* of knowledge.

¶ 93    In a nutshell, the psychiatric testimony broke down into two parts: (1) defendant's intellectual disability, or mild mental retardation, affected her reasoning, problem-solving skills, and ability to properly comprehend the circumstances surrounding her, and (2) defendant's history of abuse at the hands of Cesar and her former boyfriend, Abner, left her more a prisoner

or child than an equal in her current romantic relationship with Cesar, and she was thus unable to adequately protect young Christopher. The defense sought to offer expert testimony from two psychologists.

¶ 94     Dr. Robert Hanlon was to testify that defendant had a full-scale IQ of 58, which placed her in the bottom third of the first percentile of adults, and thus in the range of "mild mental retardation." (Recall that Dr. Cooper, from Forensic Clinical Services, measured an IQ of 54.) Dr. Hanlon found multiple neurocognitive deficits that, to various degrees, impaired defendant's comprehension, attention, memory, and language skills. She displayed "cognitive rigidity and defective problem-solving capacity" and read at a second-grade level.

¶ 95     Dr. Joan Leska was to testify to defendant's cognitive and functional deficits that resulted from the interplay of two factors: (1) her intellectual disability (as documented by Dr. Hanlon) and (2) defendant's history of physical, sexual, and emotional abuse at the hands of Cesar Ruiz and her former boyfriend (and the children's father), Abner Marroquin.

¶ 96     Defendant's intellectual limitations, according to Dr. Leska, left her perpetually stuck "in the immediacy of the situation." She could not "interpret cues and assess people," "recogniz[e] dangerous or risky situations," or "integrate" information. For example, despite witnessing Cesar's violent behavior, she never came to consider him a "violent person." Her ability to think only in concrete terms, in the here and now, meant that she could not "predict that this could get much worse," that Cesar's abusive behavior could "escalate." As a result, she "did not appreciate the life-threatening possibilities of [his] violent behavior."

¶ 97     Dr. Leska's second line of proposed testimony, which was contained in her pretrial report and in her mitigation testimony at sentencing, related less to defendant's intellectual disability and more to the effects of her own abuse at the hands of codefendant Cesar and her former

boyfriend, Abner. Dr. Leska testified that much of defendant's conduct in the months leading up to Christopher's death was an attempt to "subdue and thwart the anger of Cesar Ruiz," a task for which her intellectual disability and history of domestic violence left her woefully ill-equipped. Cesar's "coercive control," exerted through violence, emotional abuse, and measures designed to isolate defendant from her family, was "pervasive and rigid." It created a "grossly unequal power differential," to which defendant reacted with ever-greater "dependency, passivity, disempowerment, and helplessness." So great was defendant's passivity in the face of Cesar's abuse and domineering control that she came to see herself "more as one of [the children]" and "not as a parent."

¶ 98     The State objected to all this testimony collectively on the grounds that it constituted a forbidden "diminished capacity defense." In the State's words, "whichever way you slice it, whichever word you are going to use. Diminished capacity versus her intellectual disability in conjunction with domestic violence ***. This is nothing more than an attempt to interject diminished capacity into it ***."

¶ 99     Defense counsel argued that the defense was "not presenting the defense of diminished capacity." Defendant argued that both the Illinois Rules of Evidence and Illinois case law permit a defendant to introduce psychological testimony to negate the *mens rea* element of an offense. Defendant emphasized, as she does on appeal, that she was not seeking testimony on the ultimate question of whether defendant did or did not possess the necessary *mens rea* at the time of the offense but, rather, merely to explain her mental and intellectual infirmities for consideration by the trier of fact.

¶ 100    The trial court agreed with the State that evidence of defendant's cognitive deficits—both her intellectual disability and the effects of her own domestic abuse—"goes to the issue of

diminished capacity, which is not a proper defense in Illinois." Defendant thus was not permitted to offer the proposed testimony in support of a reasonable-doubt theory.

¶ 101   The trial court based its ruling principally on our decision in *People v. Hulitt*, 361 Ill. App. 3d 634, 641 (2005), which held that diminished capacity is not recognized in Illinois, and thus a defendant may not introduce evidence of his mental defect or infirmity to disprove the *mens rea* element of the offense. Since *Hulitt*, other published decisions have likewise upheld the exclusion of psychiatric testimony to disprove the *mens rea* element of the charged offense, in part based on *Hulitt*. See *People v. Frazier*, 2019 IL App (1st) 172250, ¶ 36 (under *Hulitt*, " '[a]n expert may not give an opinion supporting the doctrine of diminished mental capacity because *** that doctrine is not recognized in Illinois' " (quoting *People v. Johnson*, 2018 IL App (1st) 140725, ¶ 70); *People v. Nepras*, 2020 IL App (2d) 180081, ¶ 28 (under *Hulitt*, defense expert was properly barred from testifying that defendant could not form intent to commit theft, as such testimony was "effectively a diminished-capacity defense" that is "no longer available in Illinois" and, thus, "a defendant may not raise it in the guise of a reasonable doubt argument").

¶ 102   From *Hulitt*, then, comes this rather broad-sweeping principle that Illinois does not recognize a "diminished capacity defense," and it is thus improper for a defendant to introduce such evidence to claim that the State failed to establish the required *mens rea* element of the offense. The facts of this case have forced us to re-examine the holding in *Hulitt*. In our previous decisions citing *Hulitt*, it was unnecessary to do so. Here, however, as we explain below, it is unavoidable.

¶ 103   We are confronted here with two different kinds of psychological testimony: (1) evidence of defendant's intellectual disability, previously known as mental retardation; and (2) evidence that defendant suffered from a form of "battered woman's syndrome." If *Hulitt*'s categorical ban

on "diminished capacity" evidence correctly states Illinois law, and if evidence of intellectual disability and "battered woman's syndrome" fall within this categorical ban, then Illinois law has not been consistent on this point.

¶ 104   We say that because this court has not only permitted evidence of intellectual disability to show that the State did not prove the *mens rea* of the crime—we have outright reversed convictions on that basis. See, *e.g.*, *People v. Mayo*, 2017 IL App (2d) 150390, ¶ 43 (ordering discharge of defendant, with "IQ of 48" and "mental capacity of a three-year-old," who lacked cognitive ability to have "knowingly" touched victim for his own sexual gratification); *People v. Burt*, 142 Ill. App. 3d 833, 836-37 (1986) (adult defendant with IQ of 59 could not have "knowingly" committed sexual assault given inability to understand "the nature of the sex act" or to understand minor victim's inability to understand it); *People v. Ellison*, 126 Ill. App. 3d 985, 989, 997 (1984) (reversed and remanded for new trial, as "borderline mentally retarded" defendant was entitled to mistake-of-fact instruction to show he did not "knowingly" participate in robbery).

¶ 105   Likewise, we have found evidence that a defendant suffered from battered woman's syndrome relevant to her state of mind. See, *e.g.*, *People v. Evans*, 271 Ill. App. 3d 495, 502 (1995) ("expert testimony on the battered woman syndrome would have been necessary in proving a crucial issue in this case, *i.e.*, the defendant's state of mind at the time of the killing" (internal quotation marks omitted)); *id.* at 503 ("the value of expert testimony regarding the battered woman syndrome is that it provides evidence of the effect of such abuse on a woman's mental state"); *People v. Minnis*, 118 Ill. App. 3d 345, 356-57 (1983) (trial court committed reversible error in excluding psychological testimony regarding defendant's battered-wife syndrome; State introduced evidence that defendant dismembered husband's body after killing

him to show consciousness of guilt, and psychological testimony would have provided alternative view of defendant's state of mind in doing so).

¶ 106   Perhaps, one might argue, it is a mere definitional problem; maybe those mental conditions simply fall outside the definition of the categorical ban on "diminished capacity." But for the reasons we explain below, in our attempt to divine a precise definition in *Hulitt*, we have come to question the premise of *Hulitt* itself. We are unable to find any source of Illinois law that supports the reasoning of that decision, much less a definition of "diminished capacity" under Illinois law. We find instead that, rather than attempting to determine whether mental-state evidence can be shoehorned into a vague and imprecise definition of "diminished capacity," courts should determine the admissibility of psychological or other mental-state evidence offered to rebut *mens rea* by using the same source for which they determine any other evidentiary question in an Illinois courtroom—the Illinois Rules of Evidence.

¶ 107                                          A

¶ 108   The defendant in *Hulitt*, who had recently given birth and was living amid poverty and squalor, wanted to quiet her 2½-year-old daughter and "teach her a lesson," so she tied her daughter's hands and feet together, stuffed a sock in her mouth, and wrapped tape around the child's mouth and neck. *Hulitt*, 361 Ill. App. 3d at 635. The child suffocated, and defendant was charged with first-degree murder. *Id.*

¶ 109   At trial, she sought to offer expert psychological opinion testimony from an expert, Dr. Smith, who had examined her three years later. Dr. Smith would testify that, while defendant was legally sane, defendant suffered from the mental illness of postpartum depression at the time of the murder and was "unable to appreciate the danger of her actions toward [her child] on the night of the offense." (Internal quotation marks omitted.) *Id.* at 636. The defendant argued that she was

not raising an insanity affirmative defense or asking for a guilty-but-mentally-ill finding, but instead that the expert testimony "related to defendant's state of mind at the time of the offense and was intended to show that defendant acted recklessly, in violation of the involuntary manslaughter statute [citation], rather than intentionally or knowingly in violation of the first degree murder statute." *Id.* at 636.

¶ 110   The trial court barred this expert testimony on several grounds. This court affirmed on multiple independent grounds. Among them were that a jury did not need an expert to understand depression (*id*. at 638-39); Dr. Smith lacked foundation to know whether the defendant was suffering from the condition at the specific time she committed the crime (*id*. at 639); and Dr. Smith's testimony was incompatible with the legal definition of recklessness. *Id*. at 640.

¶ 111   The court then added a fourth reason to exclude the testimony. It was here that the court discussed the concept of "diminished capacity," a paragraph at the end of the opinion that has served as the basis for several subsequent decisions. For that reason, we lay it out in full here with citations:

> "Dr. Smith's opinion, in fact, sounds more like a statement of diminished capacity than of recklessness. The doctrine of diminished capacity, also known as the doctrine of diminished or partial responsibility, allows a defendant to offer evidence of her mental condition in relation to her capacity to form the *mens rea* or intent required for commission of the charged offense. 21 Am. Jur. 2d *Criminal Law* § 38 (1998). Similar to the insanity defense in that it calls into question the mental abnormality of a defendant, it differs in that it may be raised by a defendant who is legally sane. 21 Am. Jur. 2d *Criminal Law* § 38 (1998). Diminished capacity is considered a partial defense because it is not presented as an excuse or justification for a crime but, rather, as an

27

attempt to prove that the defendant, because she was incapable of forming the requisite intent of the crime charged, is innocent of that crime but likely guilty of a lesser included offense. 21 Am. Jur. 2d *Criminal Law* § 38 (1998); 40 Am. Jur. 2d *Homicide* § 109 (1999). To show diminished capacity, there must be evidence that, at the time of the murder, the defendant did not appreciate the nature of her conduct or was incapable of conforming her conduct as a result of mental disease or defect. 21 Am. Jur. 2d *Criminal Law* § 38 (1998). As the trial court found, this is what Dr. Smith's testimony would show and sounds very much like the former insanity defense done away with by our legislature in 1995. Diminished capacity can mitigate murder to manslaughter (40 Am. Jur. 2d *Homicide* § 109, n. 2 (1999)) but it is a defense often deemed limited to specific intent crimes (40 Am. Jur. 2d *Homicide* § 109 (1999)) and is not recognized in Illinois. The court was entirely correct when it stated that Dr. Smith's opinion appeared to raise the specter of a defense which does not exist under Illinois law. Defendant could not raise it as an affirmative defense and, therefore, should not be permitted to raise it in the guise of a reasonable doubt argument. The court did not abuse its discretion in barring Dr. Smith's testimony." *Id.* at 640-41.

¶ 112   It is only fair to note that the vast majority of this discussion was general in nature and not tailored to Illinois law; nearly every citation was to the American Jurisprudence treatises that discusses doctrines among the various jurisdictions in this country. If these American Jurisprudence articles from 1999 contained any specific discussion of Illinois law, the court in *Hulitt* did not say so.

¶ 113   To the extent that *Hulitt*'s holding—that "diminished capacity" evidence is inadmissible to disprove *mens rea*—was anchored to Illinois law in any way, it could only be found in the

court's reference to our General Assembly's amendment of our insanity law in 1995. See *Hulitt*, 361 Ill. App. 3d at 641 (noting that Dr. Smith's testimony "sounds very much like the former insanity defense done away with by our legislature in 1995"). But if so, we must respectfully disagree with that reasoning.

¶ 114    For context, as the court in *Hulitt* discussed earlier in that opinion, Illinois law previously recognized a form of the insanity affirmative defense that permitted a finding of insanity if a defendant could establish one of the following: that "as a result of mental disease or mental defect, he lacks substantial capacity either to [1] appreciate the criminality of his conduct or [2] conform his conduct to the requirements of the law." 720 ILCS 5/6-2 (West 1994). In 1995, the General Assembly removed that second basis, leaving only the first as an affirmative defense in Illinois. See Pub. Act 89-404, § 15 (eff. Aug. 20, 1995) (amending 720 ILCS 5/6-2). The sponsor of the amendment explained that the definition of insanity was narrowed "to coincide with what the law is in the federal courts." 89th Ill. Gen. Assem., Senate Proceedings, Apr. 25, 1995, at 152 (statement of Senator Dillard).[1]

¶ 115    As noted, the court in *Hulitt* reasoned that Dr. Smith's testimony "sound[ed] very much like the former insanity defense" the General Assembly removed in 1995. *Hulitt*, 361 Ill. App. 3d at 641. It then concluded, without citation to Illinois law or any other source, with this: "Defendant could not raise it as an affirmative defense and, therefore, should not be permitted to raise it in the guise of a reasonable doubt argument." *Id.*

---

[1]For the sake of completeness, Public Act 89-404 was later invalidated in its entirety as violative of the single-subject rule. See *People v. Reedy*, 186 Ill. 2d 1 (1999). The amendment to the insanity law was then re-enacted in its same form. See Pub. Act 90-593, § 15 (eff. June 19, 1998) (amending 720 ILCS 5/6-2).

¶ 116   We respectfully disagree with that reasoning. Whether a doctrine is recognized as an affirmative defense is an entirely different question than whether certain evidence is admissible to disprove an element of the charged crime under the facts of a particular case.

¶ 117   An affirmative defense is a question of public policy traditionally decided by the legislature and found in statute. It is not an attack on the State's proof; rather, it presupposes that a defendant's guilt has been proven and provides a ground to wholly or partially excuse the defendant from criminal responsibility, proof of his guilt notwithstanding. See 720 ILCS 5/Art. 6 (West 2018) ("Responsibility"); *id.* § 3-2(b) (State never relieved of obligation to prove elements of offense beyond reasonable doubt, even if affirmative defense raised); *People v. Freneey*, 2016 IL App (1st) 140328, ¶ 32 ("An affirmative defense has the legal effect of admitting that the acts occurred, but denying legal responsibility for them.").

¶ 118   The General Assembly may, as it sees fit, define the elements of the affirmative defense and assign, to one party or the other, the burden of proof and standard of proof. *Patterson v. New York*, 432 U.S. 197, 210 (1977). For example, for the affirmative defense of insanity, the burden is on the defendant to prove insanity by clear and convincing evidence. See 720 ILCS 5/6-2(a) (West 2018). On the other hand, for self-defense, as long as the defendant raises some evidence of it, the State carries the burden of disproving it beyond a reasonable doubt. See *id.* § 7-1; *People v. Gray*, 2017 IL 120958, ¶ 50.

¶ 119   Quite unlike the assertion of an affirmative defense, however, when a defendant seeks to admit evidence that challenges the *mens rea* element of a crime, the defendant *is* attacking the State's proof; he is claiming that the State cannot prove him guilty of all elements beyond a reasonable doubt. That is obviously not the same thing as asserting an affirmative defense. There is no shift in the burden or standard of proof. And whether that evidence is admissible is not

dependent, in any way, on whether it satisfies or does not satisfy the elements of some affirmative defense. It is dependent, instead, on whether the evidence satisfies the requirements of the Illinois Rules of Evidence. See Ill. R. Evid. 101 (eff. Jan. 6, 2015) ("These rules govern proceedings in the courts of Illinois" with minor exceptions not applicable here).

¶ 120    We thus fail to see why evidence of a defendant's mental state is *per se* inadmissible under Illinois law simply because that evidence would not support an affirmative defense. The one should have nothing to do with the other.

¶ 121    For many of the same reasons, we cannot agree with the finding in *Hulitt* that "[d]iminished capacity *** is not recognized in Illinois." *Hulitt*, 361 Ill. App. 3d at 641. It is not recognized as an *affirmative defense*, to be sure. But we are talking here (as in *Hulitt*) about evidence offered to disprove the *mens rea* element of a charged offense. In that context, we fail to understand why we would even ask the question whether evidence is "recognized in Illinois." We do not ask that question of any other evidence. An affirmative defense, yes—either state law recognizes an affirmative defense via statute or it does not. But evidence offered at trial, generally speaking, does not require state-law "recognition" to be admissible. Neither state law nor the Illinois Rules of Evidence contain a laundry list of "recognized" admissible evidence.

¶ 122    Rather, judges routinely determine admissibility of evidence based on relevance, foundation, balancing of Rule 403 considerations, and the like. See Ill. R. Evid. 402, 403, 702, 704 (eff. Jan. 1, 2011).  It is not clear to us why, in this specific instance only, we would demand affirmative "recognition" of evidence of a defendant's mental or emotional condition to rebut the *mens rea* as a precondition to admissibility.

¶ 123    The truth is, *Hulitt* and its progeny aside, Illinois has been silent on the question of whether a defendant may offer evidence of a mental or emotional impairment to rebut *mens rea*.

31

Our supreme court has not opined on the subject in a published decision. There is nothing within

the Criminal Code of 2012 or the Code of Criminal Procedure of 1963 that contains such an

evidentiary rule or, for that matter, even mentions the phrase "diminished capacity." And the

Illinois Rules of Evidence are likewise silent on this specific topic.

¶ 124                                    B

¶ 125   Unlike Illinois, most states, via supreme court decision or a codified rule, have taken a

position on whether a defendant may introduce evidence of an impaired mental state to challenge

the *mens rea* element of an offense. Indeed, "since its inception in the United States, the

diminished capacity defense has been the subject of much debate. At present, there is a wide

divergence of views among the states concerning the admissibility of evidence of mental illness

short of insanity." *People v. Carpenter*, 627 N.W.2d 276, 282 (Mich. 2001).

¶ 126   Some states, by statute, prohibit evidence of a defendant's mental defect to disprove *mens*

*rea*. See, *e.g.*, Cal. Penal Code § 25(a) (West 2020). Some courts have disallowed it by supreme

court decision. See, *e.g.*, *Carpenter*, 627 N.W.2d at 283. Other states have allowed it. See

*Metrish v. Lancaster*, 569 U.S. 351, 367 (2013) (noting that, as of 2006, at least, " 'a substantial

majority of the States' permitted the introduction of 'mental-illness evidence to negate *mens*

*rea*.' " (quoting *Clark v. Arizona*, 548 U.S. 735, 800 (2006) (Kennedy, J., dissenting, joined by

Stevens and Ginsburg, JJ.)); *Smith v. State*, 314 S.W.3d 576, 590 (Tex. App. 2010); *State v.*

*Burge*, 487 A.2d 532, 539 (Conn. 1985).

¶ 127   Many of the states that permit it have limited its admission to crimes involving specific

intent. See, *e.g.*, *State v. Provost*, 490 N.W.2d 93, 98-99, 99 n.3 (Minn. 1992) (collecting cases).

Some courts, in determining the admissibility of mental-state evidence to rebut proof of *mens*

*rea*, have distinguished between evidence of mental impairments that rise to the level of a *mental*

*defect or disease*, which is prohibited, as compared to evidence of "behavioral tendencies" or "mental slowness" that fall short of a defect or disease, which is admissible. *State v. Malone*, 444 P.3d 733, 738 (Ariz. 2019); *People v. Vanrees*, 125 P.3d 403, 409 (Colo. 2005).

¶ 128    The reasons against the admissibility of this evidence vary. Some courts have based their decision on legislative intent. For example, the fact that the legislature provided for insanity and guilty-but-mentally-ill statutes, but none permitting mental-state evidence to rebut *mens rea*, suggested that the legislature never intended to allow mental-state evidence for that evidentiary purpose. See, *e.g.*, *Carpenter*, 627 N.W.2d at 283. Likewise, the fact that a state adopted the Model Penal Code but did not adopt the evidentiary rule contained in that Code, permitting evidence of a defendant's mental defect falling short of insanity to rebut *mens rea*, suggested that the state legislature disapproved of that evidentiary rule. See *Malone*, 444 P.3d at 737; Model Penal Code § 4.02(1) (Am. Law Inst. 2017).

¶ 129    Other courts have reasoned that, while insanity is a bright-line rule, mental illness short of insanity contains gradations of gray not amenable to a clear-cut determination of guilt or innocence. See, *e.g.*, *State v. Wilcox*, 436 N.E.2d 523, 529 (Ohio 1982). Others fear that admission of this evidence for this purpose will distract juries and invite sympathy and thus nullification. See, *e.g.*, *State v. Mott*, 931 P.2d 1046, 1053 (Ariz. 1997).

¶ 130    These are perfectly reasonable considerations. And though *Hulitt* did not discuss any of these concerns, perhaps we could address these matters on first impression. But in our view, it would be unwise to do so, for the following reasons.

¶ 131    First, as we have noted, having now had the occasion for the first time to revisit *Hulitt*, we cannot agree with its reasoning. The fact that evidence of a defendant's mental illness, short of insanity, cannot serve as an affirmative defense should not mean, necessarily and

automatically, that such evidence could never be relevant and otherwise admissible in a particular case to rebut evidence of *mens rea*.

¶ 132   Second, if we are to continue to adhere to such a *per se* rule, what is our definition of "diminished capacity?" The definitions and applications vary from jurisdiction to jurisdiction in scope and context.

¶ 133   *Hulitt* used this definition: "To show diminished capacity, there must be evidence that, at the time of the murder, the defendant did not appreciate the nature of her conduct or was incapable of conforming her conduct as a result of mental disease or defect." *Hulitt*, 361 Ill. App. 3d at 641 (citing 21 Am. Jur. 2d *Criminal Law* § 38 (1998)). That definition is quite similar to the Illinois insanity statute before its amendment in 1995 to conform with federal law. Compare 720 ILCS 5/6-2(a) (West 1994). In the decisions that have followed *Hulitt*, we have used a different definition: " '[a]n impaired mental condition—short of insanity—that is caused by intoxication, trauma, or disease.' " *Id.* (quoting Black's Law Dictionary 199 (7th ed. 1999)); see also *Frazier*, 2019 IL App (1st) 172250, ¶ 35 (using same definitions from *Johnson*).

¶ 134   This is not a small concern, for the concept of "diminished capacity" could include or exclude any number of things. Does it include, for example, evidence of a defendant's intellectual disability (previously termed "mental retardation")? The trial court here thought it did and thus applied *Hulitt*'s *per se* ban. Does it include evidence that a defendant suffered from battered-woman syndrome? Again, the court here thought so and applied the *per se* ban.

¶ 135   Does the definition include dementia or PTSD or postpartum depression? Should it be limited to evidence of a mental "defect" or "disease?" Should it apply only to offenses requiring specific intent?  Should we allow evidence of a defendant's "behavioral tendencies" but disallow

such evidence if based on a specific mental defect or disease? *Malone*, 444 P.3d at 738. Do we

limit it to expert testimony or include lay testimony in the *per se* ban?

¶ 136    Perhaps before 2011, an appellate court would be in a position to make judgments of that

kind, even without guidance from our supreme court and in the absence of any state statute. But

in 2011, our supreme court adopted the Illinois Rules of Evidence, whose purpose is to "codify[]

the law of evidence in the state of Illinois." Ill. R. Evid. Committee Commentary (eff. Jan. 1,

2011). Because evidentiary rules were previously "dispersed throughout case law, statutes, and

Illinois Supreme Court rules, requiring that they be researched and ascertained from a number of

sources," our supreme court charged its drafting committee with placing "all of the basic rules of

evidence in one easily accessible, authoritative source." *Id.*

¶ 137    Notably, those rules purported to incorporate "the current law of evidence whenever the

Illinois Supreme Court or the Illinois Appellate Court had clearly spoken on a principle of

evidentiary law within the last 50 or so years." Ill. R. Evid. Committee Commentary (eff. Jan. 1,

2011). Yet the ban announced in 2005 by *Hulitt* on the use of diminished mental condition to

negate *mens rea* did not find its way into those rules.

¶ 138    In our view, rather than continue to adhere to a *per se* doctrine of inadmissibility that is

not capable of precise definition and that was not adopted by the Illinois Rules of Evidence,

courts in Illinois should determine the admissibility of mental-deficiency evidence to rebut *mens

rea* like they consider the admissibility of any other evidence in Illinois—on a case-by-case

basis, by applying those very Illinois Rules of Evidence.

¶ 139    The reasonable critiques leveled against this mental-state evidence offered to rebut *mens

rea* either fall by the wayside or are addressed in light of the Illinois Rules of Evidence. Any

concern over what our legislature intended should no longer be a question when our evidentiary

rules have been codified by our state's highest court. The fear that a defendant's mental infirmity, short of insanity, could pose the risk of distracting the jury or inviting sympathy in a given case is addressed by the gatekeeping function of Rule 403, which requires that the court consider whether the probative value of evidence is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Ill. R. Evid. 403 (eff. Jan. 1, 2011). And of course, first and foremost, the evidence must be relevant and helpful to an understanding of *mens rea*, which will probably be true only in a limited number of cases. See Ill. R. Evid. 402, 702 (eff. Jan. 1, 2011).

¶ 140   Nothing would stop the General Assembly from passing a statute barring, allowing, or limiting the use of mental-state evidence at trial to negate *mens rea*. Likewise, our supreme court could adopt a rule of evidence, or issue a judicial opinion, on this subject. But until any of those things happen, we should not force trial judges into guesswork about whether certain mental-state testimony can be shoehorned into an undefined category of "diminished capacity." Instead, psychological or other testimony that is offered to negate the required *mens rea* element of an offense should be addressed like any other expert testimony, or any other piece of evidence, offered in a criminal case in Illinois. As the law currently stands, we should no longer employ this "diminished capacity" terminology and let the Illinois Rules of Evidence, and trial judges, do their jobs.

¶ 141                                   C

¶ 142   We will thus consider the proposed expert testimony defendant offered, not based on some categorical rule but based on traditional evidentiary rules. Even if we do not agree that the trial court should have excluded this testimony simply because it constituted "diminished capacity" evidence, we still might agree with the trial court's ultimate ruling excluding the

evidence. We review that ruling, not the reason for its ruling, and may affirm it on any basis in the record. *People v. Rudd*, 2020 IL App (1st) 182037, ¶ 61.

¶ 143    For the reasons we will explain below, we find that some of the proffered psychological testimony was properly excluded as irrelevant, and some of it was at least potentially relevant. (As a side note, because the experts here used the phrases "mentally retarded" and "mental retardation," we will use those phrases as well, even though Illinois long ago replaced those phrases throughout state law with "intellectually disabled" and "intellectual disability." See Pub. Act 97-227, § 1 (eff. Jan. 1, 2012)).

¶ 144    Defendant was charged with first-degree murder, which requires a mental state of intent or knowledge. 720 ILCS 5/9-1(a)(1)-(2) (West 2018). The State presented alternative theories of the offense: one in which defendant was guilty as a principal, meaning that she at least participated in Christopher's fatal beating, and one on which defendant was accountable for Cesar's conduct. Defendant argues only that this mental-state testimony was relevant to the accountability charge, so we will consider the proposed psychological testimony with that theory in mind only.

¶ 145    Accountability was premised on a theory of "parental duty," grounded in the notion that "a parent may not sit idly by while another person abuses her child. Parents are required to intercede on their child's behalf and, if they fail to act, they risk being held responsible for the other person's criminal conduct." *Pollock*, 202 Ill. 2d at 215-16. The charge required the jury to find that defendant knew about a danger to Christopher, had the physical ability to protect him, and failed to do so. See Illinois Pattern Jury Instructions, Criminal, No. 5.03, Committee Note (approved Oct. 28, 2016); *Pollock*, 202 Ill. 2d at 215-19; *People v. Stanciel*, 153 Ill. 2d 218, 232-37 (1992). And the defendant did not have to know about just any "danger." Because the charge

37

was first-degree murder, defendant had to "know" that Cesar's acts "create[d] a strong probability of death or great bodily harm" to Christopher. 720 ILCS 5/9-1(a)(2) (West 2010); see also *Pollock*, 202 Ill. 2d at 215 (parent must know of "a substantial risk that death or great bodily harm would result if the parent did not act to protect the child").

¶ 146   The defense's first proposed expert, neuropsychologist Dr. Hanlon, diagnosed defendant with "mild mental retardation," based principally on her full-scale IQ of 58. (Dr. Cooper, from Forensic Clinical Services, measured an IQ of 54.) Dr. Hanlon found multiple neurocognitive deficits that, to various degrees, impaired defendant's comprehension, attention, memory, and language skills. She displayed "cognitive rigidity and defective problem-solving capacity" and read at a second-grade level.

¶ 147   The defense's second proposed expert, psychologist Dr. Leska, would have opined on the significance of Dr. Hanlon's "objective neuropsychological" findings for defendant's day-to-day cognitive wherewithal and adaptive functioning—what she could and could not do, and what she could and could not comprehend, due to her mild mental retardation. Dr. Leska would have further opined on how defendant's cognitive deficits rendered her more susceptible to, and amplified the effects of, the domestic violence she had allegedly suffered.

¶ 148   Dr. Leska rendered her opinions against the backdrop of defendant's allegations that she had been sexually, physically, and emotionally abused by Abner Marroquin; that more recently, and more importantly, she had been physically and emotionally abused by codefendant Cesar Ruiz; and that Cesar also physically abused Christopher.

¶ 149   In her pretrial report, and in her mitigation testimony at sentencing, Dr. Leska opined that much of defendant's conduct in the months leading up to Christopher's death was an attempt to "subdue and thwart the anger of Cesar Ruiz," a task for which her intellectual disability and

history of domestic violence left her woefully ill-equipped. Cesar's "coercive control"—exerted through violence, emotional abuse, and measures designed to isolate defendant from her family—was "pervasive and rigid." It created a "grossly unequal power differential," to which defendant reacted with ever-greater "dependency, passivity, disempowerment, and helplessness." So great was defendant's passivity in the face of Cesar's abuse and domineering control that she came to see herself "more as one of [the children]" and "not as a parent."

¶ 150    One way defendant coped with Cesar's abuse, given her extreme passivity and lack of problem-solving skills, was "to do what she was told. To clean the house, you know, to have dinner ready. So—to get Christopher to behave."

¶ 151    Defendant's intellectual disability left her perpetually stuck "in the immediacy of the situation." She could not "interpret cues and assess people," "recogniz[e] dangerous or risky situations," or "integrate" information. For example, despite witnessing Cesar's violent behavior, she never came to consider him a "violent person." Her ability to think only in concrete terms, in the here and now, meant that she could not "predict that this could get much worse," that Cesar's abusive behavior could "escalate." As a result, she "did not appreciate the life-threatening possibilities of [his] violent behavior."

¶ 152    Broadly speaking, Dr. Leska would have thus addressed two findings about defendant: her intellectual limitations and, in a phrase, the "learned helplessness" that resulted from her own alleged history of abuse. These phenomena may have been psychologically intertwined for defendant, but they are legally distinct concepts, standing in very different relations to the possible *mens rea* elements of the offense. As far as the record shows, the trial court did not clearly distinguish the two topics for analytical purposes. And the State, as noted, actively encouraged the court to lump all this testimony together as improper "diminished capacity"

evidence.

¶ 153   The inevitable result was to blur critical legal distinctions between mental retardation and what was essentially a "battered woman" defense. Distinctions, in our view, that made the difference between admissibility and inadmissibility.

¶ 154                                                        1

¶ 155   We first consider the testimony of defendant's "learned helplessness," her inability to effectively cope with Cesar's abuse of Christopher caused largely by defendant's own history of suffering abuse from Cesar and her previous boyfriend.

¶ 156   In our view, it would not have been an abuse of discretion to exclude this testimony even under traditional rules of relevance. The thrust of this expert testimony was that her own history of suffering abuse left defendant as more like another child, like Christopher, helpless to effectively fend off or otherwise respond to Cesar's abuse of Christopher, as opposed to being Christopher's mother, charged morally and legally with protecting him.

¶ 157   As tragic as those circumstances might be, we do not find this testimony relevant to the *mens rea* of the parental-duty theory. Again, the State was charged with proving that defendant knew that Cesar's acts created a substantial risk that death or great bodily harm would result if she did not intervene to protect Christopher. *Pollock*, 202 Ill. 2d at 215. This portion of the expert testimony did not speak to that knowledge. Her inability to *respond* to the abuse did not equate to her inability to *understand the consequences or risks* of that abuse.

¶ 158   At oral argument, defense counsel seemed to pivot from arguing that this evidence was relevant to her knowledge, arguing instead that it was relevant to defendant's physical ability to protect Christopher, another element of the parental-duty theory, as noted above. Even if that argument were properly before the court, raised for the first time on appeal, we do not see how

an emotional or psychological imprisonment or sense of helplessness that defendant experienced would equate to a lack of *physical* ability to assist Christopher.

¶ 159   No matter how compelling defendant's argument may be in an emotional sense, the elements of this offense are defined by the legislature, not this court. As it currently stands, the law does not require the State to prove that defendant was psychologically or emotionally equipped to respond to the abuse Cesar unleashed on Christopher. As long as she was physically able to intervene, which she indisputably was, and as long as this emotional imprisonment did not prevent defendant from understanding the risks to Christopher of death or great bodily harm if she did not intervene, the law deems her guilty. This "learned helplessness" testimony was not relevant to the accountability charge defendant faced. It was properly excluded.

¶ 160                                            2

¶ 161   We reach a different conclusion regarding evidence of defendant's intellectual disability. We recognize that even the criminally insane defendant is often perfectly capable of forming the requisite intent to commit a crime, at least when a general-intent offense like first-degree murder merely requires an intent to commit the act, not necessarily the result—much less an appreciation of the criminality of that act. See *Stanciel*, 153 Ill. 2d at 234; *People v. Hightower*, 172 Ill. App. 3d 678, 687 (1988) ("a defendant's intent and ability to carry out an act is not affected by his inability to appreciate the criminality or wrongfulness of the act. A defendant can perform an intended act whether or not he recognizes the moral or social implications of the act. *** Thus, a defendant could intend to perform an act but still be insane.").

¶ 162   But here, in this accountability charge based on parental duty, we are not concerned with intent. At issue here is the *mens rea* of *knowledge*—whether defendant knew that Cesar's acts created a strong probability of death or great bodily harm to Christopher. And the deficit at issue

41

is an *intellectual* disability.

¶ 163   It should not be controversial to state that someone of low intelligence might lack the cognitive ability to know or understand something that a person of ordinary intelligence might grasp.

¶ 164   As noted above, we have so found in at least three cases. In *Mayo*, 2017 IL App (2d) 150390, ¶ 43, we reversed defendant's "not not guilty" finding in a discharge hearing, finding that his IQ of 48 and "mental capacity of a three-year-old" rendered him unable to *knowingly* touch the victim for the purpose of his own sexual gratification. In *Burt*, 142 Ill. App. 3d at 836-37, we reversed the conviction of a mentally retarded defendant with an IQ of 59 (higher than defendant's here), finding that an individual who "operat[ed] at the mental level" of a 7- or 8-year-old could not understand "the nature of the sex act" or the minor victims' inability to understand the sexual act; thus, he could not have "knowingly" committed criminal sexual assault. Likewise, in *Ellison*, 126 Ill. App. 3d at 989, 997, evidence that the defendant was "borderline mentally retarded" (with an IQ of 77, well above defendant's here) could have demonstrated that he did not "knowingly" participate in a robbery but rather was tricked into committing the crime.

¶ 165   Likewise, here, to the extent that defendant was charged criminally with leaving Christopher in the hands of Cesar, who then beat Christopher to death, her ability to know that doing so would lead to Christopher's death or serious bodily harm could have been compromised by her intellectual disability. It was, at bottom, a theory defendant had the right to argue.

¶ 166   Defendant's position at trial, and on appeal, is that there was no evidence that defendant personally participated in the beating of Christopher on Thanksgiving, nor was there any evidence at trial that she was even present while Cesar abused Christopher on that day. There

was, after all, no evidence at trial establishing defendant's whereabouts that day when not at Thanksgiving dinner. Nor could the medical examiner time the injuries with any precision or state that the beating happened all on one occasion, as opposed to multiple episodes that day.

¶ 167   The State claimed that all of the fatal beating took place in the coach house after dinner (with defendant present), but there was no proof of that fact. The medical examiner noted that the beating Christopher suffered would make him unlikely to eat, and recall that the boy was unable to eat dinner. Our point is simply that defendant was entitled to argue that she was not present at the time of the fatal beating, and there was at least some evidence to support that claim.

¶ 168   Of course, defendant could still be held liable based on a parental-duty accountability theory for leaving her child with an abusive boyfriend. See, *e.g.*, *Stanciel*, 153 Ill. 2d at 229, 237 (parent knew caretaker was injuring child but continued to allow caretaker to be alone with child, ultimately leading to caretaker killing child when parent was absent). That is precisely why the expert testimony—that defendant lacked the cognitive ability to see beyond the here and now, to predict a potential escalation in Cesar's violent behavior—would have been relevant. A game-changer, certain to win defendant a not-guilty verdict? Maybe not. But relevant? Absolutely.

¶ 169   In sum, defendant was entitled to claim that she was not present when her son was murdered, and she was entitled to put forth evidence that she was not guilty on a parental-duty accountability theory because she lacked the intellectual capacity to appreciate the threat to Christopher if she left him with Cesar. The psychological evidence of her intellectual disability was relevant.

¶ 170                                              D

¶ 171   Relevance, of course, is not the only consideration in determining the admissibility of evidence. The court must also consider, among other things, whether the probative value of the

testimony is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ill. R. Evid. 403 (eff. Jan. 1, 2011). The trial court here did not engage in Rule 403 balancing, as it deemed the evidence inadmissible solely on the basis that it constituted "diminished capacity" evidence under *Hulitt*.

¶ 172    Though we cannot fault the trial court for following an appellate decision, it was error to prematurely exclude the evidence without conducting the Rule 403 balancing, for the reasons we have given above. But it does not automatically follow that we must reverse here. We must first consider whether any error was harmless under these specific circumstances.

¶ 173    A harmless-error analysis is appropriate here for the simple reason that defendant was convicted of first-degree murder by general verdict of both accountability and liability as a principal actor, and defendant's claim of evidentiary error relates only to the accountability theory—*not* to her guilt as a principal actor for intentional murder. It is "well settled" that, when an indictment alleges multiple forms of a single murder, and a general verdict is returned finding defendant guilty of first-degree murder, "the net effect is that the defendant is guilty as charged in each count." *People v. Davis*, 233 Ill. 2d 244, 263 (2009); see also *People v. Morgan*, 197 Ill. 2d 404, 447 (2001); *People v. Doolan*, 2016 IL App (1st) 141780, ¶ 50.

¶ 174    Thus, we may find a trial error pertaining to the accountability charge of first-degree murder harmless beyond a reasonable doubt if the evidence of guilt under the other first-degree murder charge is overwhelming. See *Hedgpeth v. Pulido*, 555 U.S. 57, 60 (2008) (*per curiam*) (harmless-error analysis applies when jury was instructed on alternative theories of guilt and may have relied on legally invalid one in returning general verdict); *People v. Davis*, 233 Ill. 2d 244, 270, 275 (2009) (relying on *Pulido* for proposition that "in cases where a jury is instructed on

multiple theories of guilt, one of which is improper, a harmless-error analysis is applicable" and finding that, even if jury was improperly instructed on one of three murder charges—felony murder—error was harmless, as evidence of guilt for intentional or strong-probability murder based on accountability was not closely balanced).

¶ 175   We find the evidence of defendant's guilt as a principal actor to be substantial. The evidence showed, as discussed earlier, that defendant had a history of abusing Christopher, a history confirmed by Christopher, by defendant's own admissions, and by her recent domestic-battery conviction, if nothing else. And more importantly, during Joe's 911 call to report Christopher's death, defendant spontaneously blurted out, "I killed him, my Christopher."

¶ 176   We cannot explain those words as anything but an admission that defendant participated, at the very least, in Christopher's fatal beating. Defendant knew perfectly well how to accuse Cesar of killing Christopher—she did exactly that when Joe first confronted her—so it is implausible to suppose that she was "covering" for Cesar, as she told Dr. Leska she sometimes did, when she made that statement.

¶ 177   Defendant argues that her admission could have been a mere expression of parental guilt for allowing Cesar to kill Christopher. Defendant is certainly entitled to that position, but we are not required to find it persuasive. We find that explanation particularly hard to accept given that defendant has gone to great pains, at trial and particularly on appeal, to emphasize her deficiency in "abstract reasoning" (in Dr. Leska's words) as well as linguistic expression and comprehension. It is hard to believe, then, that her statement that "I killed *** my Christopher" was not meant literally but was instead a nuanced way of expressing a sense of guilt or responsibility for a fatal beating in which she did not personally participate.

¶ 178   There was, in short, ample evidence to convict defendant of murder based on a principal-

actor theory. Any evidentiary error regarding the accountability theory of parental duty was thus harmless beyond a reasonable doubt.

¶ 179                                             III

¶ 180   Next, defendant argues that the trial court erred in refusing her request to instruct the jury on the offense of endangering the life or health of a child, or "child endangerment" for short, as a lesser-included offense of the parental-duty theory of accountability for first-degree murder. See 720 ILCS 5/12-21.6 (West 2010) (renumbered as 720 ILCS 5/12C-5 by Pub. Act 97-1109, § 1-5, (eff. Jan. 1, 2013)); Illinois Pattern Jury Instructions, Criminal, Nos. 11.29, 11.30.

¶ 181   The crux of defendant's argument is that child endangerment and a parental-duty theory share the same elements except for the mental state. Both offenses are committed when a parent knows of a danger to the child but fails to act to avert that danger. The only difference is this: a parental-duty theory requires knowledge of a "strong probability" or "substantial risk" of "death or great bodily harm" to the child. 720 ILCS 5/9-1(a)(2) (West 2018); *Pollock*, 202 Ill. 2d at 215. Child endangerment, on the other hand, requires knowledge of "circumstances that endanger the child's life or health." 720 ILCS 5/12C-5 (West 2018).

¶ 182   It is not quite correct to say that these two offenses are the same except for the required mental state. In fact, they require the same "mental state," as that term is used in the Criminal Code: the mental state of knowledge. See *id.* §§ 4-3, 4-5. The difference lies in what the Criminal Code calls the "attendant circumstances" of the parent's failure to act—namely, the magnitude of the risk to the child that the defendant must know. See *id.* § 4-3.

¶ 183   In any event, even if we found that it was error to deny a child-endangerment instruction, that error would be harmless, for reasons we have already discussed at some length.

¶ 184   Ordinarily, as defendant points out, an improper refusal to instruct the jury on a lesser-included offense is not subject to a harmless-error analysis, because a finding that the instruction was warranted necessarily includes a finding that the evidence would have supported a verdict on the lesser-included offense. See, *e.g.*, *People v. Blan*, 392 Ill. App. 3d 453, 459-60 (2009). But that rule only applies when the jury is instructed on one theory of the charged offense and rationally could have convicted on the lesser-included offense.

¶ 185   Here, in contrast, as we already explained, defendant's jury was instructed on alternative theories of murder, based on principal liability and accountability. When a jury is instructed on alternative theories of an offense and returns a general verdict, and an instructional error infects only one of the alternative theories, a harmless-error analysis is appropriate. See *Pulido*, 555 U.S. at 60; *Davis*, 233 Ill. 2d at 275 (any error in instructing jury on felony-murder charge was harmless, as evidence of guilt for intentional or strong-probability murder based on accountability was strong).

¶ 186   A child-endangerment instruction (assuming one was warranted) would have allowed the jury to acquit defendant on the accountability theory if it so chose, but it would have had no impact on the guilty verdict based on a principal theory. And as we have already determined the evidence of guilt based on a principal-actor theory to be overwhelming, we find any instructional error regarding the accountability theory to be harmless beyond a reasonable doubt.

¶ 187                                                    IV

¶ 188   Next, defendant argues that the State made several improper and prejudicial remarks in its closing and rebuttal arguments. For the most part, these contentions have little merit and can be quickly resolved.

¶ 189   First, defendant argues that the State "greatly exaggerate[ed]" Marilu's testimony that defendant "smacked" Christopher a few weeks before his death. As defense counsel elicited on cross-examination, Marilu saw an open-handed slap on the cheek. But when the prosecutor used a hand gesture in closing argument to illustrate Marilu's testimony, the prosecutor's palm was facing down, with the thumb pointing to the left, and the hand moving from side to side. This, defendant contends, was an illustration of a "chop," rather than a "slap." A slap, we presume, would feature the palm facing sideways and the thumb pointing upwards.

¶ 190   But none of this is evident from the transcript; the description of the gesture comes from the record of the defense objection that counsel made after the closing argument. We have no way of deciding for ourselves whether counsel's description is even fair and accurate. To this extent, it is not clear that the issue is reviewable at all.

¶ 191   But even if we assume that counsel's description of the hand gesture was spot-on, it is all but frivolous to suggest that this warrants a new trial. The jury heard Marilu's testimony for itself—particularly her testimony on cross-examination, in which she described the act that she witnessed with some precision. So the jury could decide for itself, based on that testimony, what (if anything) defendant did to Christopher on that particular occasion. Defendant would have us believe that the jury's assessment of the evidence, and in turn its verdict, was swayed to some meaningful degree by the angle of the prosecutor's hand in a demonstrative gesture, rather than the witness's clear testimony, as elicited by defense counsel. We are not willing to assume so little of the jury.

¶ 192   Second, defendant argues that the State relied on Marilu's testimony to argue that defendant and her mother, Mary, lied about the source of Christopher's black eye at the baby shower in early November. In part, defendant is reiterating her claim that she was prejudiced by

48

the improper admission of Marilu's testimony without adequate pretrial notice. We addressed that issue above. As for the substance of the prosecutor's argument, we find no error.

¶ 193   As we have noted, the explanation given to Katrine for Christopher's November black eye—that he fell out of a display bed at JC Penny—largely replayed defendant's explanation of Christopher's previous black eye to Nurse Wallenberg, in which defendant had claimed that he fell off a table or out of a chair. That explanation was quickly debunked by the nurse and the detective, and defendant was convicted of domestic battery for beating Christopher. The State was arguing, in essence, that Christopher's November black eye was the same thing all over again. And that was a fair inference for the State to argue based on the available evidence.

¶ 194   Third, defendant argues that the State, on six different occasions, called Katrine a "hero" or described her as "heroic." Without citation, defendant accuses the prosecutor of improperly "vouching" for her credibility.

¶ 195   Sometimes, a prosecutor's description of a witness as a "hero" will function as a comment on the witness's veracity or credibility, and when it does, it may be improper vouching. See, *e.g.*, *People v. James*, 2017 IL App (1st) 143391, ¶¶ 75-79; *People v. Rivera*, 235 Ill. App. 3d 536, 540-41 (1992). But here, the State used this description to underscore that Katrine, and her husband Joe, were the only ones who went to the coach house to check on Christopher when concerns about his well-being began to mount. Indeed, part of what made this case so tragic was how little was done to protect a young, vulnerable child from clear signs of abuse. None of that is to say that the prosecutor personally assured the jury that Katrine was credible and thus truthful about one or another disputed question of fact. See, *e.g.*, *People v. Potts*, 2021 IL App (1st) 161219, ¶ 280 (prosecutor may not offer personal opinion about witness's credibility or use credibility of state's attorney's office to bolster witness).

¶ 196  Nor, for that matter, was there a single factual dispute of any consequence that turned on Katrine's credibility as a witness. Katrine's testimony did touch on Christopher's injuries and apparent beatings in July and early November, but in neither instance did Katrine claim to see defendant hit Christopher. Defendant's own admissions, not to mention her domestic-battery conviction, told the jury all it needed to know about the July incident; Katrine's testimony was of marginal probative value on this point. Her descriptions of Christopher's November black eye, and the state of the coach house and Christopher's body at the time of his death, were amply documented in photographs and by forensic analysis. Her identification of defendant's voice, in the background of the 911 call saying that she "killed" Christopher, has never been in dispute. Her "interpretation" of defendant's words, as the defense likes to call it, is neither here nor there, since the jury heard the recording for itself. In short, even if the prosecutor had intended to vouch for Katrine's veracity—which we do not believe to be the case—we do not see how it would have had any prejudicial effect in this case.

¶ 197  We will grant defendant that the State's arguments on this score were, from time to time, emotionally charged. Sometimes, emotional appeals can go too far and make it unduly difficult for the jury to think rationally about the defendant's guilt. See, *e.g.*, *People v. Johnson*, 208 Ill. 2d 53, 75-76 (2003). And this was nothing if not an emotionally charged case, exactly the kind in which a closing argument could run too hot. But whatever emotion the State injected—and we could hardly expect the State to present a fully sanitized, clinical version of the events that led to the violent death of a young child, allegedly at the hands of his own mother—defendant does not identify anything that clearly crossed the line. Defendant's principal example, the State's remark that nobody other than Katrine and Joe bought Christopher a present for his fourth birthday, was certainly irrelevant, but it falls far short of prejudicial misconduct warranting a new trial.

¶ 198   Fourth, defendant argues that the State improperly characterized her statement, "I killed him, my Christopher," as a confession, when it could be understood as nothing more than a mother lamenting the death of her child. For reasons we have already discussed, we do not find that interpretation plausible. But even if we grant (for argument's sake) that this interpretation is plausible and reasonable, the State's competing interpretation—on which defendant admitted she killed Christopher, in the literal sense of the term—was *also* plausible and reasonable. And there is no rule that prohibits the State from arguing one of two reasonable, competing inferences from the evidence.

¶ 199   Defendant further objects that the State improperly characterized the supposed confession as legally sufficient evidence of her guilt. Defendant cites *People v. Pena*, 174 Ill. App. 3d 281, 286 (1988), for the proposition that an uncorroborated confession alone is not sufficient evidence for a murder conviction. But the point in *Pena* was the familiar one that a defendant's confession is insufficient without independent proof of the "*corpus delicti*"—meaning proof that a crime was committed or, more specifically, in a murder case, "the fact of the death and that the death was caused by the criminal agency of another." *Id.*

¶ 200   There is no dispute that Christopher's death was caused by someone's criminal agency; the issue in this case is the identity of the murderer(s). See *People v. Smith*, 2015 IL App (1st) 132176, ¶ 18 ("In criminal proceedings, the State must prove beyond a reasonable doubt the following two propositions: (1) a crime was committed, the *corpus delicti*, and (2) the identity of the person who committed the crime."). And a confession alone *is* sufficient evidence of the defendant's *identity* as the murderer. *Pena*, 174 Ill. App. 3d at 286 ("A confession tending to show defendant committed the crime, along with the proof of *corpus delicti,* is sufficient to

51

justify the conviction."). That was all the prosecutor meant here. There was no misstatement of the law.

¶ 201   Fifth, defendant objects to the State's argument that she was "aiding and abetting" Christopher's murder when she obstructed Katrine's (and Joe's) entry into the coach house on the day after Thanksgiving. The State made this assertion twice before the trial court sustained the defense's objection.

¶ 202   The State's comment obviously misstates the law of accountability, if for no other reason than that Christopher's murder was complete when Katrine and Joe arrived, and accountability requires a defendant to aid or abet the principal "before or during the commission of an offense." 720 ILCS 5/5-2(c) (West 2018); *People v. Taylor*, 186 Ill. 2d 439, 445-46 (1999). The trial court should have sustained the first objection. See *People v. Terry*, 312 Ill. App. 3d 984, 994 (2000) (trial court's inconsistency in sustaining objections to improper remarks may not cure prejudice).

¶ 203   But this improper remark was of little consequence, not only because the jury was correctly instructed on the law of accountability, but more importantly, because defendant's own spontaneous admission that she killed Christopher, along with her recent history of physically abusing him, provided strong evidence of her guilt as a principal. In light of that evidence, we find no reason to believe that this remark may have influenced the jury's verdict.

¶ 204   Lastly, given all of these conclusions, we find no "cumulative error" warranting a new trial, either in the State's closing argument or in the trial as a whole. Defendant's conviction for first-degree murder is affirmed.

¶ 205                                         V

¶ 206   Defendant was sentenced to 35 years in prison for Christopher's murder. She does not claim that her sentence was excessive, but she does claim that the sentencing court abused its

discretion, and denied her a fair hearing, by refusing to consider either her intellectual disability or her alleged own experiences with domestic abuse as mitigating factors. Because she did not raise these claims in her motion to reconsider sentence, her burden, as she acknowledges, is to show second-prong plain error.

¶ 207  As previously noted, the statutory mitigating factors include a defendant's intellectual disability, defined as "sub-average general intellectual functioning generally originating during the developmental period and associated with impairment in adaptive behavior reflected in delayed maturation or reduced learning ability or inadequate social adjustment." 730 ILCS 5/5-1-13, 5-5-3.1(a)(13) (West 2018).

¶ 208  A defendant's status as a victim of domestic abuse, either before or at the time of the offense, may also be a mitigating factor, to the extent that "the effects of the domestic violence tended to excuse or justify the defendant's criminal conduct." *Id.* § 5-3.1(a)(15).

¶ 209  We presume that the trial court considered all mitigating factors and supporting evidence before it, and that presumption can only be overcome with "affirmative evidence" that the court in fact failed to do so. *People v. Burton*, 184 Ill. 2d 1, 34 (1998); *People v. Busse*, 2016 IL App (1st) 142941, ¶ 22. The trial court is not required to "set forth every reason or specify the weight it gave to each factor when determining the sentence." *Busse*, 2016 IL App (1st) 142941, ¶ 24.

¶ 210  Defendant argues that the record rebuts this presumption here. In her view, the trial court "did not give serious consideration to [her] intellectual disability." While the trial court "stated generally" that it considered the factors in mitigation, that was mere "lip service." More telling, in defendant's view, is the fact that the judge "strictly limited his discussion to the aggravating factors" when pronouncing sentence. What's more, the judge "only mentioned Dr. Leska's and Dr. Hanlon's findings to dismiss them as part of [defendant's] 'self-serving version of events.' "

¶ 211 Here is what the judge actually said:

"I've considered the factors in aggravation and mitigation pursuant to the statute. All of them. That of Dr. Leska, the reports that were tendered to me, as well, and the crime itself, obviously. There were other things I heard today and read today, as well, regarding Crystal Valdez. I'm not suggesting one way or the other about the issue about Valdez being, quote, unquote, beaten by Cesar Ruiz, threatened by Ruiz. If it happened I don't believe it. Let's put it that day [*sic*]. Most of that stuff comes in her self-serving version of events."

¶ 212 To begin, the judge did not say that Dr. Leska's and Dr. Hanlon's findings pertaining to defendant's *intellectual disability* were part of her own "self-serving version of events." In using that phrase, the trial judge was clearly referring to her claim that she was "quote, unquote, beaten by Cesar Ruiz, threatened by Ruiz." And if the phrase "quote, unquote" did not make the court's view of this claim clear enough, the judge added, "I don't believe it." In short, the trial court was not refusing to consider defendant's claim of domestic abuse by Cesar Ruiz. Rather, the trial court was indicating that it did not believe such abuse had ever occurred.

¶ 213 The trial court obviously found defendant's claim of domestic abuse by Cesar to be "self-serving" in the sense that it was based entirely on her own statements to Dr. Leska; it was not otherwise corroborated. There was, for example, no evidence of defendant ever showing any bruising or other evidence of abuse to anyone close to her. Indeed, when first subjected to custodial interrogation after Christopher's murder, defendant denied that Cesar physically abused her.

¶ 214 We should be very clear here that we fully appreciate, as Dr. Leska testified, that some domestic abuse survivors deny their abuse—initially at the very least, if not consistently. By no

means could we say, nor do we say from our position as a reviewing court, that defendant was fabricating her claims of abuse at the hands of Cesar. And other evidence in the record suggests that Cesar was cruel, controlling, and domineering toward defendant; physical abuse of defendant would not be at all inconsistent with his behavior.

¶ 215   But neither can we say that the court was beyond its rights in expressing its skepticism of defendant's statements to Dr. Leska. It is fair to note, after all, that defendant made demonstrably false statements to Dr. Leska in other contexts. Most notable, perhaps, was her claim that she did not know Christopher was being abused until his death. Dr. Leska did not find any memory impairment that could plausibly explain how defendant might forget about Christopher's hospital admission—to say nothing of her own domestic-battery trial. Or the fact that she showed Christopher's bruised torso to Marilu at Thanksgiving dinner. And this was on top of her history of papering over her knowledge of Christopher's injuries, and otherwise lying about his abuse, when confronted about it—by the police, or Nurse Wallenberg, or Katrine, or Marilu.

¶ 216   In short, there were numerous reasons, adduced at the sentencing hearing, for the court to question defendant's veracity. Given those questions and the lack of corroborating evidence, the trial court obviously found that these allegations of her own abuse at the hands of Cesar were not supported by enough reliable, credible evidence to be given any weight in the sentencing determination. (We would be hard-pressed to reverse that finding if asked, but again, defendant has not asked.) In sum, the trial court's commentary on this subject was a far cry from, as defendant puts it, refusing to consider a mitigating factor. As to the court's consideration of the domestic-abuse factor, we find no error.

¶ 217   As for defendant's intellectual disability, we reiterate that the trial court did not dismiss the experts' findings as "self-serving." Defendant's argument takes that phrase out of context.

55

What the trial court said on this score is that it considered the testimony of Dr. Leska and "the reports," plural, "that were tendered," meaning the reports of Dr. Leska and Dr. Hanlon.

¶ 218   True, the trial court did not discuss these reports in detail when it pronounced sentence or assign a specific mitigation value, so to speak, to her intellectual disability. But the court was not required to do any of this, and its failure to do so is not "affirmative evidence" that it refused to consider a mitigating factor. *Busse*, 2016 IL App (1st) 142941, ¶ 22. What's more, the trial court clearly stated on the record that it *did* consider the evidence offered in support of this factor. And it actively questioned Dr. Leska and sought clarification of her opinions throughout her lengthy testimony. That the trial court was at times skeptical of the expert's opinions does not show, as defendant contends, that the judge did not give them serious consideration. Defendant has failed to rebut the presumption that the trial court considered her intellectual disability in fashioning her sentence.

¶ 219   Two final points. First, we need not consider defendant's argument that the trial court failed to comply with the "procedural safeguards" our cases once imposed on the sentencing of an intellectually disabled defendant. Those safeguards, modeled on *Miller v. Alabama*, 567 U.S. 460 (2012), as applied to juveniles, were established as to the intellectually disabled in *People v. Coty*, 2018 IL App (1st) 162383. Our supreme court reversed that decision after defendant filed her opening brief. See *People v. Coty*, 2020 IL 123972.

¶ 220   Among other things, our supreme court in *Coty* explained that, while intellectual disability may decrease a defendant's culpability, it may also increase a defendant's future dangerousness and diminish the defendant's prospects for rehabilitation. *Id.* ¶¶ 34-38. In other words, although it is a statutory mitigating factor, intellectual disability is not always the *purely* mitigating factor that defendant says it is. Rather, it is a complex factor that can, and often does,

cut both ways. (Just like mental illness, another statutory mitigating factor. See 730 ILCS 5/5-5-3.1(a)(16) (West 2018); *People v. Thompson*, 222 Ill. 2d 1, 42-43 (2006)).

¶ 221   And that would be a fair point to make in this case: If defendant's intellectual disability rendered her more susceptible to conduct that resulted in the death of her own child—a perhaps contentious claim, given the evidence pointing to her involvement as a principal—then she may have been somewhat less culpable for Christopher's murder. But at the same time, and for the same reasons, she also posed a heightened and persistent danger to others. Defendant cannot simply assume that the trial court had to find mitigation on balance, much less that the court had to assign and announce some specific weight in mitigation to the experts' findings regarding her intellectual disability.

¶ 222   Second, and lastly, defendant's sentence hardly supports the idea that the trial court was unwilling to give serious consideration to factors that may have mitigated defendant's culpability for Christopher's murder. Because Christopher was less than 12 years old, defendant was subject to the discretionary extended-sentencing range of 60-100 years. 730 ILCS 5/5-4.5-20(a), 5-5-3.2(b)(3)(i) (West 2018). The trial court not only declined to impose an extended sentence but also imposed a sentence, 35 years, in the lower half of the 20-to-60-year range for first-degree murder. *Id.* § 5-4.5-20(a). By way of contrast, the same judge sentenced Cesar Ruiz to 75 years for the same offense. *Ruiz*, 2018 IL App (1st) 152458-U, ¶ 41.

¶ 223   Our point is not to compare the culpability of the two defendants or assess the basis for the disparity in their sentences. The point is simply that the record does not bear out defendant's assertion that the judge was motivated by bias and hostility toward her and was, for that reason, unable or unwilling to give serious consideration to her arguments in mitigation. The trial court sentenced defendant relatively leniently and stated clearly, on the record, that it considered the

evidence pertaining to her intellectual disability (for whatever worth it ultimately deemed that evidence). In the absence of any clear evidence to the contrary, we take the trial court at its word. Defendant has not shown error, much less plain error, in the trial court's consideration of the mitigating factors. Her sentence is affirmed.

¶ 224                                  CONCLUSION

¶ 225   Defendant's conviction and sentence are affirmed in all respects.

¶ 226   Affirmed.

¶ 227   PRESIDING JUSTICE GORDON, specially concurring:

¶ 228   All three justices in this case agree that the decision of the trial court should be affirmed, but for different reasons. The majority believes that the testimony of the experts should not have been barred, because Illinois has not been consistent enough to show that Illinois does not recognize the doctrine of diminished capacity, but that the trial court's error was harmless. I agree with the majority's well-written opinion that the 3 cases cited did in fact allow evidence of diminished capacity to attack the *mens rea* of the crimes. The special concurrence by Justice McBride believes that the trial court properly barred the experts from testifying because Illinois does not recognize the doctrine of diminished capacity. I agree with Justice McBride's special concurrence that the large majority of case law in Illinois supports the *Hulitt* decision and that with few exceptions, the doctrine of diminished capacity is not recognized in Illinois. 361 Ill. App. 634 (2005).

¶ 229   However, I would decide the case at bar without considering whether the doctrine of diminished capacity is or is not recognized in Illinois and thus I must write separately.

¶ 230   Basically, Dr. Hanlon was to testify that defendant had a full-scale IQ of 58, which placed her in the bottom third of the first percentile of adults, and thus in the range of "mild mental

retardation." Dr. Hanlon found multiple neurocognitive defects that, to various degrees, impaired defendant's comprehension, attention, memory, and language skills. She displayed "cognitive rigidity and defective problem-solving capacity" and read at a second-grade level. Dr. Leska was to testify that defendant's intellection limitations left her perpetually stuck "in the immediacy of the situation." She could not "interpret cues and assess people," "recogniz[e] dangerous or risky situations," or "integrate" information. For example, despite witnessing Cesar's violent behavior, she never came to consider him a "violent person." Her ability to think only in concrete terms, in the here and now, meant that she could not "predict that this could get much worse," that Cesar's abusive behavior could "escalate." As a result she "did not appreciate the life-threatening possibilities of [his] violent behavior."

¶ 231   I find the proposed expert testimony to be irrelevant and I find no error in the trial court barring this testimony because the evidence presented in this case shows that the defendant was well aware of what she and Cesar were doing to the child. To cover up the injuries inflicted on the child, she used makeup so that the injuries would not be readily apparent. She told Nurse Wallenberg, when her child was hospitalized at Hope Children's Hospital on July 2, 2011, that Christopher fell out of a chair and hit his head, and that the marks all over his body were mosquito bites. Then she later said she had grabbed and spanked him. Christopher told the nurse that the defendant hit him. During the same period of time, she told Katrine, her sister-in-law, that Christopher fell off a table at the laundromat and was at the hospital for treatment. This cover-up shows that the defendant knew her conduct was wrong and that she had the sense to cover up her conduct and the conduct of her boyfriend.

¶ 232   Defendant later told Detective Smith that "I am getting help. I punched him, I hit him, I have anger issues. I get mad, I get nervous, I slapped him, and I grabbed his real tight." The above

59

admissions show that she was well aware that her lies were not being believed, so she switched her tactics to show that she was receiving help for her conduct which was another lie to cover up what she and her boyfriend were doing to Christopher.

¶ 233   At a baby shower on November 6, 2011, Christopher was observed with another black eye covered with foundation makeup. Defendant told Katrine that Christopher climbed onto a display bed at J.C. Penny's and when he was jumping around on a bed and fell, he bumped his eye. Defendant refuted every visible injury observed by others as an accident to cover up her wrongful actions and conduct and that of Cesar towards her child. Marilu testified that a few weeks before Thanksgiving, she observed defendant smack Christopher on the face. At Thanksgiving dinner, Christopher wore a hooded sweatshirt covering his face despite the warm weather and the fact that the house was hot from the oven. Marilu observed a bruise on one of his eyelids. Christopher ate little, sat quiet and sullen with his head hanging down. Christopher vomited on the floor. Defendant showed Marilu bruises on Christopher's stomach and chest. Defendant denied that she or Cesar caused the injuries.

¶ 234   Defendant tried to block Katrine from going in her bedroom when Christopher's body was found. The 911 call can hear defendant say "I killed him, my Christopher."

¶ 235   Dr. Moser-Woertz's testimony showed that the Doctor counted no fewer than 54 injuries, which included clusters of injuries. Christopher's body was riddled from head to toe with bruises, lacerations, and swelling, including injuries on his scalp and eyelids. Many of these injuries were sustained closer to the time of death and showed evidence of significant blunt-force trauma to the areas. The hole in the drywall in defendant's residence where a mirror was hung illustrated that the hole could have reasonably been caused by defendant and/or her boyfriend slamming Christopher into the wall.

¶ 236   The evidence in this case was overwhelming that the conduct of the defendant toward her young child was an anger-management issue that had nothing to do with her intellectual and cognitive deficit. Her attempted cover-up shows she knew what she was doing wrong and she and Cesar continued the conduct until Christopher was dead. The experts' testimony would not have been relevant to the actions of this defendant and her attempted cover-up is the key.

¶ 237   McBRIDE, J., specially concurring:

¶ 238   While I agree with the decision to affirm, and that any error resulting from the trial court's ruling barring the testimony of Drs. Hanson and Leska was harmless, I do not agree with the reasoning used to reach that conclusion. In resolving the issue of whether the trial court erroneously barred the expert testimony, the authoring justice[2] needlessly and incorrectly criticizes *People v. Hulitt*, 361 Ill. App. 3d 634 (2005). The authoring justice holds that the decision was wrongly decided and unsupported by Illinois law. I disagree. I write separately on this one issue and otherwise agree with the decision to affirm.

¶ 239   The defendant in *Hulitt* was charged with the first-degree murder of her two-and-a-half-year-old daughter. *Hulitt*, 361 Ill. App. 3d at 635. Prior to trial, defense counsel disclosed the intention to call a psychologist who had interviewed the defendant three years after the offense. That psychologist concluded that the defendant was not legally insane at the time of the offense, but opined that she suffered from postpartum depression, that she "lacked the ability to cope with the stress of parenting three children," and that she was unable to "appreciate the danger of her actions" toward her daughter on the night of the offense. Defendant informed the court that she did not intend to raise an insanity defense but wanted to raise reasonable doubt through the

---

[2] Because there are two special concurrences in this case, when I discuss the rationale used by Justice Ellis, I will refer to that rationale as from the "authoring justice," rather than the "majority."

psychologist's testimony. *Id.* at 636, 640. She argued that the psychologist's testimony related to her state of mind and would demonstrate that she acted recklessly in violation of the involuntary manslaughter statute, rather than intentionally or knowingly in violation of the first-degree murder statute. *Id.* at 636.

¶ 240   The State filed a motion *in limine* seeking to bar the psychologist's testimony as to the defendant's mental capacity. *Id.* at 637. The trial court granted the motion finding that the defendant was attempting to claim diminished capacity, which did not exist in Illinois, and that the defendant was impermissibly trying to resurrect a version of the insanity statute that had previously been struck by the legislature, which permitted a defense where a defendant was unable to "*conform his conduct to the requirements of law.*" *Id.* at 636.

¶ 241   On appeal, the defendant argued that she was not attempting to claim diminished capacity, which she acknowledged was not a recognized defense in Illinois, or revive a provision of the former insanity statute. Rather, she claimed that she was trying to show that she did not have the requisite intent to commit first-degree murder. *Id.* at 637.

¶ 242   This court affirmed the trial court's decision, concluding, among other things, that the defendant could not raise diminished capacity as an affirmative defense, and therefore, she should not be permitted to raise it "in the guise of a reasonable doubt argument." *Id.* at 641. The *Hulitt* court explained:

> "The doctrine of diminished capacity, also known as the doctrine of diminished or partial responsibility, allows a defendant to offer evidence of her mental condition in relation to her capacity to form the *mens rea* or intent required for commission of the charged offense. Diminished capacity is considered a partial defense because it is not presented as an excuse or justification for a crime but, rather as an attempt to prove that defendant, because she

was incapable of forming the requisite intent of the crime charged, is innocent of that crime but likely guilty of a lesser included offense. To show diminished capacity, there must be evidence that, at the time of the murder, the defendant did not appreciate the nature of her conduct or was incapable of conforming her conduct as a result of mental disease or defect. *** Diminished capacity can mitigate murder to manslaughter, but it is a defense often deemed limited to specific intent crimes and is not recognized in Illinois." *Id.* at 640-41 (Internal citations omitted).

¶ 243   The authoring justice contends that, by the above statement, the *Hulitt* court announced a "broad-sweeping principle that Illinois does not recognize a 'diminished capacity' defense." *Supra* ¶ 102. The authoring justice criticizes the *Hulitt* decision and complains it is not based on any case authority, and that diminished capacity is not referenced in the Criminal Code or Code of Criminal Procedure. *Supra* ¶ 123.

¶ 244   What the *Hulitt* court reported, was, and still is, an accurate description of the diminished or partial responsibility defense or doctrine. And when the *Hulitt* court held that Illinois does not recognize that defense or doctrine, that holding was also a correct statement of the law.

¶ 245   The most recent description of diminished capacity from American Jurisprudence, provides the following:

¶ 246   "Although not recognized in some jurisdictions, the doctrine of diminished capacity or responsibility is recognized in others as allowing a defendant to offer evidence of his or her mental condition with respect to capacity to achieve the *mens rea* or intent required for commission of the offense charged. Under a diminished capacity defense, a defendant submits that, although he is responsible for the prohibited act, his mental capacity may have been diminished by intoxication, trauma, or mental disease so that he did not possess the specific mental state or intent essential to

63

the particular offense charged. The concept of diminished capacity is a rule of evidence which allows evidence to negate the existence of specific intent, usually introduced through expert testimony showing that a defendant was incapable of forming a criminal intent by virtue of an impaired mental condition.

¶ 247   In particular, the defense may be invoked to negate specific intent in crimes requiring proof of specific intent but it is not a defense to general intent crimes. The mental abnormality defense is relevant to the question of the defendant's guilt when a culpable state of mind is an element of the crime because the defense negates the conclusion that the defendant had a culpable state of mind.

¶ 248   The diminished capacity defense is asserted when the offense charged is a crime for which there is a lesser included offense because the successful use of this defense renders the defendant not guilty of the particular crimes charged, but does not preclude a conviction for a lesser included offense. The diminished capacity defense is only available to a defendant who admits criminal liability and concedes full responsibility for the act but contests degrees of guilt, claiming that he or she is less culpable due to a mental condition. Diminished capacity is not considered a justification or excuse for a crime, but rather an attempt to prove that the defendant, incapable of the requisite intent of the crime charged, is innocent of that crime but may well be guilty of a lesser one.

¶ 249   Although the defense of diminished capacity is similar to that of insanity, it is distinct from the insanity defense in that it may be raised by a defendant who is conceded to be legally sane. 'Diminished capacity' arises out of a mental disorder usually not amounting to insanity that is demonstrated to have a specific effect on one's capacity to achieve the level of culpability required for a given crime. Unlike the required insanity determination that a defendant must be unaware of

the nature of his acts or must be unable to distinguish between right and wrong, a diminished capacity defense has a different focus: it addresses the pinpointed attempt to negate the presence of an essential mental element of the crime. Furthermore, a verdict of not guilty by reason of insanity is likely to result in the commitment of the accused to a mental hospital, while a verdict of not guilty because of the defendant's diminished capacity may result in the defendant's being set free." 21 Am. Jur. 2d Criminal Law § 36 (Feb. 2022) (citations omitted).

¶ 250   The above authority, though more expansive than the description in *Hulitt*, sets forth the doctrine of diminished responsibility as it has been interpreted throughout the country. Based on those varied descriptions, it is clear that Illinois does not recognize such a defense.

¶ 251   Illinois has a comprehensive legislative framework which absolves one from criminal responsibility based upon the defense of insanity. Our insanity provision is patterned after § 4.01(1) of the Model Penal Code, which provides: "A person is not responsible for criminal conduct if at the time of such conduct as a result of a mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law." Mental Disease or Defect Excluding Responsibility, Model Penal Code § 4.01(1). As noted in *Hulitt*, however, the second prong, providing that a person is not responsible if he or she "lacks *** capacity *** to conform his conduct to the requirements of the law" was removed by the Illinois legislature in 1995. See *Hulitt*, 361 Ill. App. 3d at 636, citing 720 ILCS 5/6–2(a) (West 1994). Other than that revision, our insanity statute tracks the above language, and has remained in place for more than 25 years. That framework provides:

"(a) A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity to appreciate the criminality of his conduct.

(b) The terms 'mental disease or mental defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

(c) A person who, at the time of the commission of a criminal offense, was not insane but was suffering from a mental illness, is not relieved of criminal responsibility for his conduct and may be found guilty but mentally ill.

(d) For purposes of this Section, 'mental illness' or 'mentally ill' means a substantial disorder of thought, mood, or behavior which afflicted a person at the time of the commission of the offense and which impaired that person's judgment, but not to the extent that he is unable to appreciate the wrongfulness of his behavior.

(e) When the defense of insanity has been presented during the trial, the burden of proof is on the defendant to prove by clear and convincing evidence that the defendant is not guilty by reason of insanity. However, the burden of proof remains on the State to prove beyond a reasonable doubt each of the elements of the offenses charged, and in a jury trial where the insanity defense has been presented, the jury must be instructed that it may not consider whether the defendant has met his burden that he is not guilty by reason of insanity until and unless it has first determined that the State has proven the defendant guilty beyond a reasonable doubt of the offense with which he is charged." 720 ILCS 5/6-2 (West 2018).

¶ 252 As the above clarifies, the insanity defense in Illinois allows one to be relieved of criminal responsibility for conduct where "as a result of mental disease or mental defect, he lacks substantial capacity to appreciate the criminality of his conduct." The Illinois legislature, however, has explicitly provided that a person is "not relieved of criminal responsibility for his conduct" where he or she is suffering from a mental illness, short of insanity. Instead that person may be found guilty but mentally ill. By enacting this comprehensive statutory scheme including the insanity

defense and a finding of guilty but mentally ill, the Illinois legislature has conclusively determined when a mental disease or defect can serve as a basis for relieving one of criminal responsibility.

¶ 253    Other states with similar statutory schemes have also found that diminished capacity is not a recognized defense in those states. In *People v. Carpenter*, 464 Mich. 223, 237 (2001), the Michigan supreme court held that "there [wa]s no indication *** that the [Michigan] Legislature intended to make diminished capacity an affirmative defense." The Michigan supreme court relied on its legislature's "enactment of a comprehensive statutory scheme concerning defenses based on either mental illness or mental retardation demonstrates the Legislature's intent to preclude the use of *any* evidence of a defendant's lack of mental capacity short of legal insanity to avoid or reduce criminal responsibility by negating specific intent." (Emphasis in original)). By enacting a comprehensive statutory framework which included insanity, and guilty but mentally ill, the Michigan legislature

¶ 254    "already conclusively determined when mental incapacity can serve as a basis for relieving one from criminal responsibility. We conclude that, through this framework, the Legislature has created an all or nothing insanity defense. *** [T]he Legislature has already contemplated and addressed situations involving persons who are mentally ill or retarded yet not legally insane. *** [S]uch a person may be found 'guilty but mentally ill' and must be sentenced in the same manner as any other defendant committing the same offense and subject to psychiatric evaluation and treatment. Through this statutory provision, the Legislature has demonstrated its policy choice that evidence of mental incapacity short of insanity cannot be used to avoid or reduce criminal responsibility by negating specific intent."

¶ 255    Similarly, I would conclude that the statutory scheme enacted by the Illinois legislature forecloses the use of evidence of diminished capacity, based on a mental disease or defect, or mental illness, short of insanity, which would avoid or reduce criminal responsibility.

¶ 256    Additionally, and as set out above, our insanity statute is patterned after section 4.01 of the Model Penal Code. Section 4.02(1) of the Model Penal Code has been repeatedly described by courts outside of Illinois as the defense or doctrine of diminished capacity, and provides that "(1) Evidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did or did not have a state of mind that is an element of the offense." Evidence of Mental Disease or Defect Admissible When Relevant to Element of the Offense, Model Penal Code § 4.02. Section 4.02 of the Model Penal Code was not adopted by the Illinois legislature, and at least one other state supreme court has relied on the failure to adopt section 4.02 as a rejection of the doctrine of diminished capacity. See *State v. Mott*, 187 Ariz. 536, 540 (1997) ("The Arizona legislature, however, declined to adopt the defense of diminished capacity when presented with the opportunity to do so. Arizona's criminal code was based on the Model Penal Code. *** The legislature's decision not to adopt [section 4.02] of the Model Penal Code evidences its rejection of the use of psychological testimony to challenge the *mens rea* element of a crime."). I would similarly conclude that the Illinois legislature's adoption of an insanity defense modeled after section 4.01, and its concomitant failure to adopt section 4.02, is an obvious rejection of the diminished capacity defense. Accordingly, and as the court in *Hulitt* recognized, there is no question that Illinois does not recognize partial or diminished responsibility for criminal conduct when that conduct is based upon a mental disease or defect, or mental illness, short of insanity.

¶ 257    Illinois is consistent with many other jurisdictions in rejecting the diminished capacity defense. *State v. Wilcox*, 70 Ohio St. 2d 182, 199 (1982) ("the partial defense of diminished capacity is not recognized in Ohio."); *Carpenter*, 464 Mich. at 241 (rejecting the diminished capacity defense in Michigan); *Mott*, 187 Ariz. at 540 (noting that Arizona has "rejected the theory of diminished responsibility."); *Jackson v. State*, 160 S.W.3d 568, 573 (Tex. Crim. App. 2005) ("Texas does not recognize diminished capacity as an affirmative defense"), *DeBlase v. State*, 294 So. 3d 154, 210 (Ala. Crim. App. 2018) ("Alabama does not recognize diminished capacity as a defense to a criminal charge.")' *Lewis v. State*, 170 So. 3d 1245, 1248 (Miss. Ct. App. 2015) ("Mississippi law does not recognize diminished capacity as a defense to a criminal charge."); *Crawford v. State,* 121 Nev. 744, 757 (2005) ("the technical defense of diminished capacity is not available in Nevada."); *Evans v. State*, 946 So. 2d 1, 11 (Fla. 2006) ("diminished capacity is not a viable defense in Florida."); *Weber v. State*, 971 A.2d 135, 158 (Del. 2009) ("a diminished responsibility or capacity defense *** is not available in Delaware."); *Cardine v. State*, 475 N.E.2d 696, 698 (Ind. 1985) ("Indiana has not recognized the separate legal defense of diminished capacity."); *State v. Thompson*, 665 So. 2d 643, 647 (La. 1995) ("Louisiana does not recognize the defense of diminished capacity."); *State v. Bouwman*, 328 N.W.2d 703, 706 (Minn. 1982) (Minnesota "reject[s] the doctrine of diminished responsibility."); *Johnson v. Commonwealth*, 70 Va. App. 45, 53 (2019) (Noting that Virginia courts have "repeated[ly] reject[ed] *** expert testimony to establish diminished capacity."). Even California, which has been described as a "pioneer[ ] [of] the diminished capacity defense" (see *Wilcox*, 70 Ohio St. 2d at 187), abolished the diminished capacity defense by statute in 1982. See *West's Anno. Cal. Penal Code Section 28 (1982 Supp.)*; West's Cal. Leg. Service 1981, Chapter 404, at page 1201, Section 4.

¶ 258    The few jurisdictions that recognize the diminished capacity defense have often based that decision on the unfairness of allowing the affirmative defense of voluntary intoxication to relieve one of criminal responsibility, but not relieving or absolving a person of criminal responsibility for a mental impairment, short of insanity, for which a person may have no control. See *U.S. v. Brawner*, 471 Fed 2d 969, (1972); *Wilcox*, 70 Ohio St. 2d at 193. This type of reasoning may make sense in jurisdictions that recognize voluntary intoxication as a defense. Illinois, however, does not. See 720 ILCS 5/6-3 (West 2018) ("A person who is in an intoxicated or drugged condition is criminally responsible for conduct unless such condition is *involuntarily* produced and deprives him of substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." (Emphasis added)).

¶ 259    Additionally, the authoring justice lists, but glosses over, the primary and fundamental reasons that *Hulitt* affirmed the trial court's decision to bar the defendant's psychiatric testimony, which were generally unrelated to diminished capacity. The appellate court pointed out that the proposed expert had no knowledge regarding the defendant's state of mind at the time of the offense because he was opining about impressions formed three years after the offense, rather than personal observations at or near the time of the offense. *Hulitt*, 361 Ill. App. 3d at 639.

¶ 260    Additionally, the reviewing court observed that a defendant's state of mind at the time of the offense is a question of fact for the jury. Mental states, such as an intent to kill, are not usually established by direct evidence and may be inferred from a defendant's conduct and the circumstances surrounding the commission of the offense. The court acknowledged that the admissibility of psychiatric evidence regarding a defendant's intent or lack thereof, the ultimate issue in a murder prosecution, depends on whether the expert will testify " 'to facts requiring

scientific knowledge not within the common knowledge of the jury.' " *Hulitt*, 361 Ill. App. 3d at 638, quoting *People v. Denson,* 250 Ill. App. 3d 269, 281 (1993).

¶ 261   The *Hulitt* court rejected the need for expert testimony on the subject of defendant's depression, finding that it was the type of evidence within a juror's common knowledge. The court explained that the circumstances at the time of the offense were of a character that would be easily understood by a juror—specifically, that defendant was overwhelmed after having given birth just days earlier; she was isolated, alone and taking care of two young children and a newborn without any real assistance from others. From all of this, the *Hulitt* court concluded that the jury, as fact finder, could determine without expert testimony whether the defendant acted recklessly.  Since the doctor's testimony as proffered would bear directly on the ultimate question of defendant's mental state, whether defendant was consciously aware of the danger of her actions toward her child, his testimony would have eliminated the possibility of the jurors determining for themselves whether defendant acted intentionally, knowingly, or recklessly and, as a consequence, it was properly refused.

¶ 262   In support of its claim that *Hulitt* improperly found that Illinois has a "categorical ban on 'diminished capacity,' " the authoring justice contends that our courts have "not been consistent on this point." See supra ¶ 103. As support, the authoring justice references three decisions— *People v. Mayo*, 2017 IL App (2d) 150390; *People v. Burt*, 142 Ill. App. 3d 833 (1986); and *People v. Ellison*, 126 Ill. App. 3d 985 (1984)—and claims that this court "has not only permitted evidence of intellectual disability to show that the State did not prove the *mens rea* of the crime—we have outright reversed convictions on that basis" *Id.,* ¶ 104. A close examination of those decisions does not support the quote above, and those three decisions are not inconsistent with the *Hulitt* decision.

¶ 263   In *Mayo*, the defendant had been charged with aggravated criminal sexual abuse and battery and was found unfit for trial. *Mayo*, 2017 IL App (2d) 150390, ¶ 2. After a discharge hearing, the defendant was found "not not guilty." *Id.*, ¶ 3. The appellate court reversed, noting the undisputed evidence that the defendant had an IQ of 48 and the mental capacity of a three-year old child. The appellate court concluded that the defendant clearly lacked the cognitive ability to have knowingly touched the victim for defendant's own sexual gratification. *Id.*, ¶ 43.

¶ 264   The authoring justice also cites *People v. Burt*, 142 Ill. App. 3d 833, an appeal involving another adult male defendant, who was found unfit for trial and who appealed a finding that he was guilty of criminal sexual assault after a discharge hearing. Again, there was no question that the defendant in *Burt* had an IQ of 59, and cognitively functioned at the level of a second or third grade child. The appellate court reversed the lower court's guilty finding because the defendant could not have "knowingly" committed a sexual assault of two young girls, given his inability to understand the nature of the sex act or to understand the young victims' inability to understand the same concept.

¶ 265   Last, the authoring justice cites *People v. Ellison*, 126 Ill. App. 3d 985, where a new trial was granted to the defendant who was "borderline mentally retarded." The reviewing court held that the defendant was entitled to a mistake of fact jury instruction to show that he did not "knowingly" participate in the offense of burglary.

¶ 266   These three decisions do not conflict with the *Hulitt* decision. Diminished capacity was not an issue, nor were there any attempts to raise such a defense, in those cases. As for the first two decisions, the reviewing courts' decisions were based upon the State's failure to prove the defendants' guilt in a discharge hearing, and the *Ellison* decision concerned the judge's refusal to give a jury instruction on the defense of mistake of fact. Although the issue of defendant's *mens*

*rea* or knowledge was raised in these cases, there was no claim that the trial court improperly precluded psychological testimony.

¶ 267   The authoring justice references two other decisions, which involved battered woman syndrome. In *Evans*, 271 Ill. App. 3d 495, 502 (1995), the appellate court reversed the trial court's denial of statutorily allowed expert witness fees. In *Minnis,* 118 Ill. App. 3d 345, 356-57 (1983), the appellate court granted a new trial where the trial court refused to allow expert evidence to rebut the State's argument that defendant's acts of dismembering her husband's body showed her consciousness of guilt. However, there was no objection to that evidence on the basis that it was an improper use of diminished capacity evidence, or that the trial court improperly excluded evidence based upon that defense. The decision in *Minnis* decision predated *Hulitt* by more than two decades, and again, did not concern the use of diminished capacity evidence.

¶ 268   While the authoring justice chastises *Hulitt* for a lack of authority, it is the authoring justice who is ignoring settled law with no real basis. Both parties in this case, at trial and on appeal, acknowledge that diminished capacity is not a recognized defense in Illinois. Neither party suggests that the *Hulitt* decision was wrong. Instead, defense counsel distinguishes *Hulitt*, contending that *Hulitt* concerned an improper attempt by the defendant to show that a "mental defect" made it impossible for the defendant to form the requisite mental state, and that the defense here was not attempting to raise diminished capacity. Rather the purpose of presenting this evidence was to rebut the State's claim that she had knowledge of the injuries caused by the codefendant, and that defendant did not have the knowledge of a substantial risk of serious harm if she did not intervene to protect her son from codefendant.

¶ 269   Based on all of the above, I do not adopt the authoring justice's analysis in its resolution of why the trial court erred when it precluded the use of the expert testimony regarding defendant's

intellectual disability. While I disagree with the authoring justice's criticism of *Hulitt* and would conclude, like the court in *Hulitt*, that Illinois does not recognize the defense of diminished capacity, that does not mean that evidence of a defendant's mental health or intellectual disability can never be introduced. If tailored appropriately and properly introduced under the Illinois Rules of Evidence, expert testimony may be used to challenge the State's burden of proof. I would find that a defense based on diminished capacity was not raised here.

¶ 270   In this case, prior to trial, the defense filed a formal motion to admit evidence of conditions affecting the defendant's ability to form intent or knowledge. The defense requested, among other things, that both expert and lay witnesses be permitted to explain the extent of defendant's intellectual disability. Defense counsel specifically asked the court if it would permit expert psychological testimony regarding defendant's low IQ and her mild mental retardation.

¶ 271   The State argued that the presentation of any expert testimony concerning defendant's intellectual disability was not being used to negate her intent or knowledge but was an improper attempt to raise a diminished capacity defense. The defense responded that it was the State's burden to prove defendant's knowledge, an element of the offense under the duty of parental care, that Illinois law does not generally bar expert testimony on the subject of mental state, and that barring such testimony would violate defendant's right to present a full, fair and complete defense to the charges.

¶ 272   On the day of trial, defense counsel argued that Dr. Hanlon's testimony was necessary because the State was proceeding not only on the theory that defendant was the principal actor, but it was also presenting the theory of accountability under the parental duty of care. Since liability under the theory of parental duty required proof that defendant knew about the abuse and the severity of her son's injuries, and that she had a duty to protect her son, the defense argued that

the proffered expert testimony on defendant's intellectual disability would be relevant to aid the jury in deciding whether she possessed the requisite mental state of knowledge.

¶ 273   Significantly, the trial court allowed the jury to hear from witnesses about defendant's inability to function in other areas. There was proffered testimony that defendant's cognitive or intellectual functioning level was much lower than that of all but a very small percentage of the general population. Defendant's father and other lay witnesses explained how defendant relied on many other persons for the most basic tasks, as when she asked for advice on whether she should take her son to the hospital in July. The evidence also showed that defendant could not maintain gainful employment, and did not finish high school after she became pregnant with her first child. She had learning difficulties from an early age, and had difficulty with her speech until the age of ten. Defendant did not have a driver's license and did not own an automobile. Before she started receiving child support, defendant had no income and did not have a checking account.

¶ 274   While the court originally indicated that expert testimony concerning evidence of defendant's low IQ and of her mild mental retardation could be introduced during the defense case, it suddenly reversed itself and barred this evidence entirely after the trial began.

¶ 275   I would not conclude that the evidence that the defense attempted to elicit in this case was evidence of diminished capacity.  As defendant explains in her brief, her experts would not "have opined on the ultimate issue" of her *mens rea* or that she was incapable of forming the requisite mental state. Rather, the defense was simply attempting to negate the State's burden to prove defendant's knowledge, and evidence of defendant's intellectual limitations and low IQ, which placed her in almost the lowest possible percentile of the population, was relevant to that issue. The defense could have elicited testimony regarding how a low IQ impacts how one thinks or reacts differently than someone without those intellectual limitations. Precluding this evidence in

this case, under these facts, was error, not because it was an attempt to introduce improper diminished capacity evidence, but because the proposed psychological testimony was relevant, had a sufficient foundation and went directly to whether the State could establish that defendant knew that codefendant's alleged acts created a duty on the part of defendant to protect her child. I think that the court should have allowed the expert testimony on defendant's intellectual disability because it corroborated the lay testimony, and it is the type not within the common knowledge of jurors.

¶ 276 I agree with the authoring justice's suggestion that the rules of evidence should have been the judge's guide in ruling on the State's motion to bar the expert testimony, rather than trying to interpret whether this proposed evidence ran contrary to the diminished capacity defense as the State suggested. I think that trial courts should be cautious when confronted with the prosecution's claim that expert psychological testimony is an improper attempt to present a diminished capacity defense.

¶ 277 I also agree the trial error committed here was subject to the harmless error rule because the jury returned general murder verdicts. The authoring justice correctly points out that defendant's claim of error relates only to the State's theory of her accountability and not to defendant's guilt as a principal. Because there was overwhelming evidence of defendant's guilt, the error is harmless and defendant's judgment of conviction and sentence should be affirmed. See *People v. Lerma*, 2016 IL 118496, ¶ 33 (outlining "three approaches to determine whether an error such as this is harmless beyond a reasonable doubt: (1) whether the error contributed to the defendant's conviction; (2) whether the other evidence in the case overwhelmingly supported the defendant's conviction; and (3) whether the excluded evidence would have been duplicative or cumulative.").

**No. 1-18-1463**

| | |
|---|---|
| **Cite as:** | *People v. Valdez*, 2022 IL App (1st) 181463 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 12-CR-00507(02); the Hon. Stanley Sacks, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Chan Woo Yoon, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Janet C. Mahoney, Assistant State's Attorneys, of counsel), for the People. |